49 U.S. 317 (1850)
8 How. 317
LEWIS BISSELL, PLAINTIFF IN ERROR,
v.
MARY B. PENROSE, DEFENDANT.
Supreme Court of United States.

*322 It was very elaborately argued by Mr. Benton and Mr. Gamble, for the plaintiff in error, with whom was Mr. Geyer, and by Mr. Good and Mr. Ewing, for the defendant.
*330 Mr. Justice NELSON delivered the opinion of the court.
This is a writ of error to the Circuit Court for the District of Missouri. The case below was an action of ejectment by the plaintiff, (the defendant here,) to recover against the defendant a moiety of a tract of land in the township of St. Louis, and in which she obtained a verdict and judgment.
*331 The title of the plaintiff was derived from a confirmed Spanish concession, under the act of June 30, 1836; of the defendant, from a location of a New Madrid certificate, under the act of February 17, 1815. Both rest upon acts of Congress; and the question is which has the elder or better title.
We shall, therefore, lay out of view, in proceeding to the examination the case, a class of cases referred to on the argument, founded on these Spanish claims, which were prosecuted under the act of May 26, 1824, and which underwent very elaborate discussion, both at the bar, and by the court. United States v. Arredondo et al., 6 Peters, 691; Soulard and others v. United States, 4 ib. 511; Smith v. The same, 10 ib. 326; United States v. Clarke, 8 ib. 436.
That act empowered the District Court, upon which original jurisdiction was conferred, to hear and determine these claims according to the stipulations of the treaty of 1803, the law of nations, and the laws and ordinances of the Spanish government, and in conformity with the principles of justice.
The inquiry there was not into the legal title; but into the equitable right under the treaty, with a view to a confirmation of these imperfect grants, if entitled to confirmation according to Spanish law, so that the grantee might be clothed with the legal estate.
The inquiry was difficult and embarrassing, on account of the scanty and imperfect materials within the reach of the courts from which to collect Spanish laws and ordinances, as they consisted of royal orders, orders of the local governors, and also of the usages and customs of the provinces, which were not readily accessible to the profession or the courts in this country.
The case before us depends upon the construction of our own acts of Congress, disembarrassed from any inquiries into the origin of these grants, or into the rights and principles upon which they were founded, or which made it the duty of the government under the treaty to acknowledge them. Inquiries of this kind were closed on the confirmation of the grant by the act of 1836. The title then became complete. It became an American, not a Spanish title.
One of the principal questions arising under these acts of Congress, and, indeed, in our judgment, every material question presented here, was either directly or by necessary implication involved in the decision of the case of Stoddard v. Chambers, heretofore decided by this court and reported in 2 Howard, 284.
The plaintiff there claimed under a Spanish concession, confirmed by the act of 1836; the defendant, under a location by *332 virtue of a New Madrid certificate, in pursuance of the act of 1815. The defendant and those under whom he claimed had been in possession since 1819. The Spanish concession was, like the one before us, general and unlocated, except by a private survey in January, 1806.
The court decided that the plaintiff, deriving title under the confirmed claim, held the better title, on the ground, that in 1816, when the New Madrid certificate was located upon the premises in question, the tract was reserved from sale or private entry by virtue of the tenth section of the act of 1811, and being thus reserved, the location was void; and, further, that it was not within the protection of the second section of the act of 1836, confirming Spanish grants, as the locations there referred to were locations made in pursuance of some law of the United States; that, in the case before the court, it was made against law.
In the case before us, the Spanish concession was made to the five sons of Benito Vasquez, for eight hundred arpens each, to be laid off in one or two places of the vacant domain. The grant was made February 16, 1800.
The eldest son (Benito) conveyed his interest in the concession to Rodolph Tillier, 11th February, 1806. The latter located it, by procuring a private survey, the 27th of the same month.
The time when the claim was filed in the recorder's office at St. Louis, under the act of 1805, does not appear; but it must have been before the 25th of August, 1806, as we find the evidence of the claim presented to the Board of Commissioners on that day, including the grant, the survey, and other proof going to establish it.
The tenth section of the act of 1811 (2 Stat. at Large, 665) provided, that, till after the decision of Congress thereon, no tract of land shall be offered for sale, the claim to which has been in due time, and according to law, presented to the recorder of land titles in Louisiana, and filed in his office, for the purpose of being investigated by the commissioners, &c.
The argument against the application of the clause to the claim before us is, that the concession to Vasquez, being general and unlocated, giving a right to the eight hundred arpens in no particular part or parcel of land in the public domain, but in any and every part, and the private survey designating and locating the tract being a nullity, and to be disregarded, the premises in question were not, and could not have been, reserved from sale by the filing of this vagrant claim; and hence were open to location under the New Madrid certificate in 1816, at the date of the entry.
*333 Now, the Spanish concession to Mordecai Bell, in Stoddard v. Chambers, under which the plaintiff derived title, was of a similar character: the private survey, therefore, must have been regarded as having designated and located the tract, so far as to give effect and operation to the reservation of it from sale.
It is only upon this ground that the case can be upheld. Otherwise, the location of the New Madrid certificate was made in pursuance of law, and the defendant in under it held the better title. The tract was not covered by any claim, within the contemplation of the act of 1811. To give effect to it, the claim must designate the particular tract.
But if this question were an open one, and to be decided the first time by the court, we should feel ourselves obliged to reaffirm the same conclusion which we have supposed necessarily involved in the case already mentioned.
The act of 1805, sec. 4, (2 Stat. at Large, 326,) provided, that a plat of the tracts claimed should accompany the written notice of the claim directed to be filed in the office of the recorder.
The act of 20th February, 1806, (2 Stat. at Large, 352,) repealed this clause, and extended the powers of the Surveyor-General over the public lands in Louisiana, making it his duty to appoint deputy surveyors, &c., and the commissioners were authorized to direct such surveys of the claims presented, as they might deem necessary for the purpose of their decision,  the survey to be at the expense of the claimant.
The act also declared, that every such survey, as well as every other survey, by whatever authority theretofore made, should be held and considered a private survey only; and that all the tracts of land, the titles to which might be ultimately confirmed by Congress, should, prior to the issuing of the patents, be resurveyed, if judged necessary, under the authority of the Surveyor-General, at the expense of the parties. Sec. 3.
The act of March 26, 1804, (2 Stat. at Large, 283,) forbade settlements on the public lands within the territory of Louisiana; and also surveys, or any and every attempt to survey, or designate boundaries, by marking trees or otherwise, declaring, at the same time, the act an offence punishable by fine or imprisonment. Sec. 14.
The act of 1805, as we have seen, required the claimant to accompany the claim filed with a plat of the tract.
It is apparent, therefore, unless this act operated as a modification, by implication, of the restriction in the act of 1804 in respect to surveys, the benefits under it would be limited to the *334 single class of claimants, who had happened to procure surveys of their tracts by a Spanish officer prior to the cession under the treaty. Whether it had this effect, or not, is at this day a matter of no particular importance: it is certain, that such was the practical construction given to the act at the time; as we find that numerous surveys of the tracts claimed were made after the passage of the act of 1805, and before that of 1806 dispensing with the plat. This construction was, also, recognized by the government, and the surveys directed to be regarded by the commissioners in their proceedings, as affording a sufficient designation of the tract claimed under the concession.
In the instructions of the Secretary of the Treasury to the board, under date of March 25, 1806, one month after the passage of the act, he observed, (speaking of the authority conferred on the board to order surveys,) that, as the authority was discretionary, it was presumed they would exercise it only in cases where it would be actually necessary, as it was not intended to vex the claimants with repeated surveys; and that, where they were satisfied that those surveys which had been executed before the receipt of his communication were sufficient to enable them to form a correct decision, they need not order new ones; and the observation, he said, would apply, whether the previous surveys had been executed under the authority of Soulard, or by any other person whatever. (Part 2, Public Land Laws, p. 672.)
Nothing can be more direct and express than these instructions; and the records of the proceedings of the several Boards of Commissioners under the act of 1805, and the acts succeeding it down to that of July 9, 1832, show, that they uniformly acted upon them. These private surveys constitute a part of the evidence of the claim upon which their decision was founded.
They were necessary to give description and locality to two important classes of these Spanish concessions:  1. A grant or order of survey for a given number of arpens, conferring upon the grantee the right to locate it upon any part of the royal domain, at his election; 2. A grant designating some natural object only, such as the head or sources of a river, as the place where the tract should be located. These two classes constituted no inconsiderable portion of the claims filed in the offices of the register and recorder, and afterwards presented before the commissioners. Among the incomplete grants, they probably constituted at least one half of the number. Of the first fifty in the report of the 27th of November, 1833, twenty-eight *335 are of this description; it is fair to presume the same proportion exists throughout.
The effect claimed, upon the above view, for these private surveys, was denied on the argument, on the authority of the cases decided under the act of 1824, to which we have already referred; but the distinction will be apparent on an examination of those cases, and a slight attention to the difference in the two modes of proceeding upon these claims.
Under that act, it was held by the court, that, in order to enable the claimant to recover, the land must have been severed from the general domain of the king of Spain prior to the cession of the territory by a grant which gives, either in its terms, or by a reference to some description, locality to the tract; or if the grant was vague, and gave only an authority to locate, the location must have been made by the official surveyor;  that a private survey could have no such effect as to sever the tract from the public domain under either the Spanish or American government; and that no government ever admitted such effect to be given to private surveys of its warrants, or orders of survey.
In the proceedings before the Board of Commissioners, the object of the private survey is not a severance of the tract from the public domain; nor is this the effect of it: that is done by the confirmation of the grant by the act of Congress, and not before. The object is the selection of the tract by the claimant that he is entitled to locate by virtue of his general grant, by means whereof he is enabled to present his claim in full to the board for their decision. A general grant or order of survey is not simply a vagrant right to the given number of arpens in some part of the public domain; but carries along with it the right, and without which it is valueless, to have it located with metes and bounds, that it may be occupied and enjoyed. In the absence of this description and location, the claimant would be disabled from presenting his full claim under the Spanish concession for adjudication by the board. The act of 1806 providing for private surveys, and the instructions of the Secretary founded thereon, removed every embarrassment of the kind, and were, doubtless, so intended at the time.
The acts of 1832 and of 1836 confirm the above view. The former organized a new Board of Commissioners, and made it their duty to examine all unconfirmed claims to land theretofore filed in the office of the recorder, according to law, founded upon any incomplete grant, concession, warrant, or order of survey; and also, that, in examining them, they should take into consideration as well the testimony taken before the former *336 boards upon the claims, as such other testimony as might be admissible under the rules adopted for taking testimony before the previous commissioners.
It should be recollected, that the reports of the previous commissioners upon these unconfirmed claims were before Congress at the time of the passage of this act; and that those reports contained the substance of the evidence in support of each claim, including these private surveys; and with this knowledge, it will be seen, they have made it the duty of the board to take that testimony into their consideration in passing upon them.
Congress have thus virtually recognized these private surveys as competent and proper evidence of the particular tract of land claimed under the grant or concession, carrying out thereby the construction previously given to the act of 1806, and the instructions of the Secretary.
The board are directed to examine all the unconfirmed claims remaining in the office of the recorder, founded upon these incomplete grants, and orders of survey; and to examine them upon the evidence already furnished by the claimants, and in the possession of the government; and to show that the examinations were conducted in conformity with these directions, we need only turn to the reports of the board, at different times, to the Commissioner of the Land Office, and which were also laid before Congress. It will there be seen that these private surveys are invariably used as a part of the evidence, in each case, where one has been made, for the purpose of giving description and locality to the claim.
The concession before us is embraced in the report of the 27th of November, 1833, as No. 19. It contains the original grant, the private survey of February 27, 1806, together with the evidence of several witnesses produced by Tillier, the assignee and claimant; and among others a witness was called to prove the handwriting of the Governor to the concession, and of Mackay to the plat of the survey.
We have said that the act of 1836 also confirms this view of the case.
The second section of that act provides, that if it shall be found that any tract confirmed, or part thereof, had been previously located by any other person under any law of the United States, or had been surveyed and sold by the United States, the confirmation shall confer no title to such lands in opposition to rights acquired by such location and purchase; but the individual whose claim is confirmed shall be permitted to locate so much thereof as interferes with such location or *337 purchase on any unappropriated land of the government within the State.
It will be perceived that the right to re-locate by the Spanish claimant is confined to the case of an interfering location or purchase of the whole or a part of the tract of land confirmed, omitting altogether to make provision for the case of a confirmation of an unlocated concession or order of survey. If the argument, therefore, is well founded, that these surveys are a nullity, and incapable of giving description and locality to the claim, Congress have not yet provided for one half of them under the act of 1836; and further legislation will be necessary to carry into effect their clear intention, as declared in the act of 1832. We cannot think they are chargeable with any such omission or oversight, or that a proper interpretation of their acts leads to such a conclusion; but the contrary.
Our conclusion, therefore, is that the private survey by Mackay in 1806, of the 800 arpens granted to Benito Vasquez by the Spanish governor, February 17, 1800, of which Tillier was the assignee, and which was filed in the recorder's office under the act of 1805, designated and located the grant so as to give effect and operation to the act of 1811, reserving the premises from sale, which reservation was continued down by subsequent acts to 1829.
It has been argued, that the act of 1836 confirms only the Spanish concession in the abstract, without regard to the plat of survey or claimant, if an assignee of the grant. The act provides, that the decisions in favor of land claimants made by the recorder and the commissioners, under the act of 1832 and the supplemental act of 1833, as entered in the transcript of decisions transmitted by the commissioners to the Commissioner of the Land Office, and by him laid before Congress, be, and the same are hereby, confirmed.
Now, the transcript of these decisions embraced, as required by the act of 1832, the date and quantity of each claim, and the evidence upon which each depended, together with the authority under which it was granted. The claimant was the party who had filed the claim in the office of the recorder, and had prosecuted it before the Board of Commissioners. His name, of course, appeared,  Rudolph Tillier in the case before us. He represented the interest of one of the sons of Benito Vasquez, in quantity eight hundred arpens. There were four other sons, each of whom was entitled to the same quantity. Tillier procured the private survey of his share, and filed his separate claim for that amount, together with the conveyance from the original grantee, and, under these circumstances, it is insisted *338 that, upon the true construction of the act, the confirmation was in favor of the son, and not of the assignee.
It is certainly difficult to perceive what right or claim the son had, either before the commissioners or Congress, to be confirmed. Having parted with all his interest, he had neither land, nor claim, nor was he a claimant; as that term is regarded as applicable to those only in whose name the claim was filed with the recorder, under the act of 1805. By that act, every person claiming lands, &c., by virtue of any incomplete grant, &c., shall deliver to the recorder a notice, &c., of the nature and extent of his claim; and, also, the grant, order of survey, deed, conveyance, or other written evidence of his claim, to be recorded: providing at the same time, in the case of a complete grant, that the claimant need only record the original grant, together with the order of survey and plat; all other conveyances and deeds to be deposited with the recorder: thereby making a distinction between the two cases, as it respects the derivative title; and, in both, clearly contemplating that the assignee might be a claimant.
This is the view taken of the question in the case of Strother v. Lucas, on each occasion when it was before this court. (6 Peters, 772; 12 ib. 458.) It was there held that the confirmation was to be deemed to be in favor of the person claiming it. The construction has entered into the usage and practice of the land office, as may be seen by the instructions from that office and the opinion of the Attorney-General on the subject. (2 Land Laws, 747, 752, and 1043.)
As it respects the branch of the argument, that the confirmation was irrespective of the location of the tract by the private survey of Mackay, we refer to the view we have already taken of that question, without any further remark.
It has also been argued, that Tillier put on file in the recorder's office, at the time of giving notice of his claim, two plats of the tract of land claimed, each embracing different parcels; and that the uncertainty as it respects the parcel claimed under the concession takes the case out of the reservation from sale under the act of 1811.
The case shows that there were two plats protracted upon the same sheet of paper on the files of the office, covering different parcels; and that the name of the claimant was written at full length on the face of one of them; that but one was before the commissioners, and that corresponding to the one on file with his name upon it; that this one includes the premises in question; the other does not.
When this second plat was protracted upon the same sheet *339 of paper, or how it came on the files of the office, or whether Tillier was in any way connected with it, are matters unexplained at the trial, and left altogether to conjecture. The connection is but an inference from the fact, that it has been found on the same piece of paper on which his was protracted; but, as his was marked, and identified with his name, and that too in connection with his claim to the tract, also on file, we do not perceive that any one could be misled who might resort to the office for the purpose of ascertaining the land thus intended to be appropriated; and as it respects the proceedings before the commissioners, also on the files of the office, none of the objections taken existed in point of fact.
It has been supposed that this case is distinguishable from the case of Stoddard v. Chambers, on the ground that there the concession was confirmed, in terms, according to the survey. If the view we have taken of these private surveys be correct, the difference at once disappears. But with reference more particularly to the objection, it is to be observed, that in the report of the commissioners under date of 27th November, 1833, which included one hundred and forty-two claims, of which the present case is one, the form of their decision as expressed, in respect to these imperfect grants, is uniformly in the words here used.
In the report of the board in 1835, in which the confirmation of the claim in Stoddard v. Chambers is included, a change of persons having taken place in the commission, a different and more particular form of expression was adopted. They, usually, confirmed according to the survey, or according to the possession, or a given number of arpens, as the case might be.
In cases where the report recommends the confirmation of the claim according to the survey, the effect of the confirmation under the act of 1836 is, probably, to conclude the government; so that an error in the private survey cannot be corrected on a resurvey of the tract. When recommended in the general form of the present case, any such error may be corrected, agreeably to the intention of Congress in declaring, as they did, in the act of 1806, that these surveys should be regarded only as private surveys. This is the distinction made at the land office, founded upon the opinion of the Attorney-General; and is, we think, the only one between the two cases.
It was also suggested, on the argument, that the cases of Mackay v. Dillon, and Les Bois v. Bramell, (4 How. 421, 449,) contained principles in support of the defence in this case. We have examined them attentively, and find nothing decided there in conflict with the views expressed in this case.
*340 In the former, the question was between a confirmed Spanish grant and the commons of the city of St. Louis, under which the defendant held; and which had been, also, confirmed by the act of 1812. There had been a private survey of the commons by Mackay in 1806, and in which he had at the same time marked the boundaries of his own lot. His claim was confirmed under the act of 1836; the claim to the commons, as we have seen, in 1812; the latter, therefore, holding the elder title. But the confirmation of the commons was very special, the act declaring that all the rights, titles, and claims to town or village lots, out lots, common field lots, and commons, in, adjoining, and belonging to the several towns or villages, including St. Louis, which lots have been inhabited, cultivated, or possessed prior to the 20th of December, 1803, shall be, and the same are hereby, confirmed to the inhabitants of the respective towns or villages, &c.; and making it the duty of the principal deputy surveyor, as soon as may be, to survey and mark, where the same had not already been done according to law, the out boundary lines of the several towns and villages, so as to include the out lots, common field lots, and commons thereto respectively belonging.
The act of 1831 (4 Stat. at Large, 435) has no bearing upon the question of boundary.
The question of boundary being left at large by the very special terms of the act of confirmation, a great deal of evidence was given on the trial for the purpose of ascertaining the limits of these lots, out lots, common field lots, and commons in and adjoining the town. But the court, in submitting the case to the jury, instructed them, virtually, that the boundary and extent of the commons were to be determined by the private survey of Mackay in 1806; an error that was obvious, whether we regard the terms of the act of confirmation, or the nature and effect of the survey; and for which the new trial was granted.
There is nothing in the other case bearing upon the question except that the second instruction given and approved favors the views expressed in the case before us.
The case of Jourdan v. Barrett, 4 Howard, 169, was also referred to as bearing upon the question. The case involved the right to back lands on the Mississippi River between front proprietors; and an attempt was made by the defendant to conclude the right by the effect of a private survey, which was properly denied by the court. The case has no application to the present one. No such effect is claimed for the survey, and all that is contended for in respect to it is derived from acts of *341 Congress, and applies only to the class of cases in question. The effect depends upon the construction of these acts.
Upon the whole, after the most careful consideration that we have been able to bestow upon the case, the conclusions at which we have arrived are, 
1. That the private survey by Mackay, on the 27th of February, 1806, of the 800 arpens granted to Benito Vasquez, of whom Tillier was the assignee, and which was filed in the recorder's office with his claim, under the act of the 2d March, 1805, designated and located the grant, so as to give effect and operation to the act of 1811, reserving the premises in question from sale.
2. That the title was confirmed to Tillier, the assignee, as claimant, under the act of 1836.
3. That the location of the New Madrid certificate in 1816, under which the defendant holds, was inoperative and void, as has already been decided in the case of Stoddard v. Chambers, heretofore referred to.
It follows, therefore, that the plaintiff, deriving title under Tillier, the confirmee, has an elder and better title, as was decided by the court below.
For these reasons, we are of opinion that the judgment of the court should be affirmed.
Mr. Justice McLEAN dissented.
In my judgment, this case is not within the decision of the case of Stoddard v. Chambers. In that case, the claim was confirmed "to the said Mordecai Bell or his legal representatives, according to the survey." But in this case the claim was confirmed "according to the concession." Now, until a concession is located, it can give no claim to any specific tract of land, and consequently cannot come within the reservation of any of the acts of Congress. And the main question in the case was, whether there was such a survey or designation of this concession as to bring it within the above acts.
The first Board of Commissioners, who acted on this claim in 1806 and in 1810, rejected it. As appears from their record, the concession only was before the board when they finally acted upon the subject. But a new and more favorable board was constituted in 1832, and it appears from their record, that, on the 9th of October in that year, "the sons of Vasquez, Benito, Antoine, Hypolite, Joseph, and Pierre Vasquez, claiming 800 arpens each under a concession dated 17th of February, 1800, was presented. Also a plat of survey dated 7th February, 1806, of 800 arpens." "Pascal Cerré, being duly sworn, *342 saith, that the signature to the concession is in the handwriting of Delassus; that the signatures to the survey are in the handwritings of Mackay and Antoine Soulard."
On the 2d of November, 1833, the board again met, and their record states that "the sons of Vasquez, each claiming 800 arpens of land under a concession from Charles Dehault Delassus"; and that "they can see no cause for entertaining the idea that the said concession was not issued at the time it bears date, as intimated in the minutes of the former commissioners." And they "are unanimously of opinion, that this claim ought to be confirmed to the said Benito, Antoine, Hypolite, Joseph, and Pierre Vasquez, or their legal representatives, according to the concession."
On the 11th of February, 1806, Benito conveyed to Rudolph Tillier his "right, title, and interest, claim and pretension and demand, in and to a certain tract of land not yet located or surveyed." And Tillier says, "I do hereby assign, transfer, sell, and set over, unto Clement B. Penrose, all my right, title, interest, property, claim, and demand of, in, and to a certain concession purchased of Benito Vasquez and assigned to me on the 11th of February, 1806, and plat of survey made for me, and dated 27th February, 1806, for value received." This assignment bears no date, but it was acknowledged the 31st of October, 1818.
Frederic R. Conway, a witness for plaintiff, testified that he was one of the late Board of Commissioners that confirmed this claim; that the said original survey of Mackay, given in evidence by plaintiff, was the plat that Tillier claimed by, as he understood it; and that no other survey was exhibited to the commissioners, so far as he remembered, connected with this claim; that the survey was not noted in the tabular statement contained in the proceedings of said board, which omission, he thought, was by the mistake of the clerk.
The following certificates of surveys were given in evidence, one by the plaintiff and the other by the defendant:  "I do certify that the above plat represents 800 arpens of land, French measure, situated in the district of St. Louis, Louisiana Territory, and surveyed by me at the request of the proprietor, who claims the same by virtue of a Spanish grant. Given under my hand at St. Louis, the 27th day of February, 1806. Signed, James Mackay. Received for record, St. Louis, the 27th of February, 1806. Signed, Antoine Soulard, Surveyor-General of Louisiana."
The other certificate is in the same words. These plats and certificates were recorded by the recorder of land titles on the *343 same page. It was proved that one of these surveys covered the land in controversy, and that the other did not. The name of Tillier was written on one of the plats, but by whom, at what time, and under what circumstances, does not appear. From the loose manner in which the recorder's office and the papers connected with it seem to have been kept, and the ready access to them by all parties, it would be a dangerous principle of evidence, to consider the simple indorsement of a name on a plat as identifying the owner of the land. And especially where the surveyor nowhere states for whom the survey was made.
The court instructed the jury, "that the land included in the survey given in evidence, and which was made for Rudolph Tillier, assignee of Benito Vasquez, on the 27th of February, 1806, by James Mackay, and which was officially resurveyed in conformity to the act of Congress of the 4th of July, 1836, and which resurvey is numbered 3,061, and was approved by Joseph C. Brown on the 29th of March, 1842, was reserved from location and sale at the time McNight and Brady's location, under a New Madrid claim, was made, and therefore the location under said claim is invalid, as against the title of said Vasquez," &c.
Among the instructions prayed for by the defendant, which the court refused to give, was the following:  5. "If the jury find from the evidence that Rudolph Tillier, under whom the plaintiff in this case claims the land in question, filed his claim with the recorder of land titles, and, as a part of the evidence of his claim, filed two plats of the land claimed, one of which plats would embrace the land now in the defendant's possession, and the other would not embrace that land, then there is no reservation of the land in the defendant's possession from sale, which would prevent the location of the land in question, under the certificate in favor of John Brooks or his legal representatives."
The deposition of Conway, one of the commissioners who confirmed this concession, was introduced to supply a defect in the record. He states that the original survey of Mackay, which Tillier claimed by, was before the commissioners, and no other plat, so far as he can remember. Now if this evidence was admissible, it was for the consideration of the jury. It was intended to correct the record, and show that the survey was acted upon by the commissioners, although no entry was made of it by the clerk in the tabular statement. It may well be doubted whether parol evidence was admissible for this purpose, especially after the lapse of some fourteen years. In a *344 matter involving title to real estate, parol evidence cannot be heard to correct the record which the commissioners were required to keep, of their proceedings.
As the evidence was heard, and does not appear to have been overruled or withdrawn from the jury, it was their province to act upon it. But by the instruction given, there was nothing left for the jury to decide. They were instructed that the claim of the plaintiff was reserved from location and sale when the New Madrid location was made, and consequently the latter was void. This ruled the whole case.
If the statement of Conway were not admissible, there was no evidence to show that any survey was before the commissioners at the time they confirmed the concession. And it is certain that no entry was made upon their record to show a sanction of any survey. It does appear that a survey of the concession was before the commissioners who rejected the claim in 1806. And it also appears that on the 9th of October, 1832, "a plat of survey dated 7th February, 1806, of 800 arpens, was before the new commissioners. But on the 2d of November, 1833, when the concession was confirmed, no survey appears to have been before them, and they refer to none.
If the two surveys made by Mackay of 800 arpens each, "for the proprietor," were admitted to have been made at the instance of Tillier, it leaves the location of the concession uncertain. Both surveys were executed on the same day, and were recorded on the same page. Under Tillier's right, he could survey only 800 arpens; and if he surveyed two tracts each of that quantity it was a fraud upon the public. Under the acts of Congress no tract of land was reserved as a Spanish claim, which was not surveyed or so specifically designated as to show with reasonable certainty its boundaries. There is nothing on the record or in the parol proof to show which of the plats, if either, was made at the instance of Tillier. Both surveys were made "for the proprietor," and as they bear the same date, it may be presumed they were made for the same person. But whether this be so or not, they present a state of uncertainty which is fatal to the Spanish claim. The mere name of Tillier, on one of the plats, without explanation, is no proof of its identity. An entry on the record to identify the survey would have been sufficient. In the absence of such evidence, the survey made or approved by Joseph C. Brown in 1842 does not supply the defect. He must have acted arbitrarily, or from circumstances which existed at the time he acted. There was nothing to guide him as to the true survey at the time the New Madrid location was made. And that was the *345 period of time to which the facts must apply, and the reservation of the Spanish claim be shown to have been made. The two surveys then existed and were on the record, and if neither was specially designated as Tillier's claim, there was no location of it within the reservation act. He could not claim both surveys, and as there was nothing on record to guide the New Madrid claimant in his location, he cannot be chargeable with notice.
Under these circumstances, I think the court erred in its instruction to the jury, that the Spanish claim was reserved from sale, and that the New Madrid location was void. I think, for this error, the judgment should be reversed.

Order.
This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Missouri, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.