## THOMPSON et al. v. DUMAS.

(Circuit Court of Appeals, Fifth Circuit. February 8, 1898.)

### No. 632.

1. LOCATION OF TEXAS LAND—CONFLICTING LOCATIONS—ABANDONMENT—LACHES.
   In 1859 appellee's ancestor located a genuine land certificate on the land in controversy, and returned field notes of the survey to the general land office. In 1869 he first learned of conflicts with surrounding surveys, and returned corrected field notes, and again in April, 1871, and in September, 1873. In November, 1872, an adverse location was made; and May 27, 1873, patent issued, under which appellants claim. The land was unoccupied until January, 1882, when appellee took possession thereof, and has ever since held quiet, peaceable, and exclusive possession, under claim of title, under the location made by her ancestor. March, 1885, O. filed in the circuit court an action at law against appellee and appellants to determine the conflicting claims, and recover the land, under the 1873 patent. An agreement was filed that the court should hear and determine the whole controversy; but, when the case was ready for trial, the judge declined to proceed under the agreement, and allowed appellee to present her case by bill in equity, which she did, praying a decree establishing her title, and canceling the patent. Held, that there was no abandonment of the original location, and no laches, and that appellee is entitled to the relief asked.

2. SAME—CONFLICTING SURVEYS—DUTY OF OFFICERS—RIGHTS OF APPLICANT.
   Under Act Tex. Oct. 24, 1871, relating to the location of land certificates, it is the duty of the land office and surveyor's office to make corrected field notes of the survey embracing land located by the holder of a genuine land certificate who applied for a location on vacant public domain, and paid or tendered the legal fees therefor; and when an application for patent under such location is pending, and the applicant has done all that the law requires of him, the land embraced in his application is not vacant public domain, subject to entry or location by another.

Appeal from the Circuit Court of the United States for the Northern District of Texas.

W. S. Simpkins, Wm. Thompson, and R. E. Bumpas, for appellants. F. C. Dillard, for appellee.

Before McCORMICK, Circuit Judge, and NEWMAN and PAR-LANGE, District Judges.

McCORMICK, Circuit Judge. On the 9th day of September, 1842, a land certificate was issued by the proper authority in Texas to Gonefàcio Herrera, for 1,280 acres of land. This certificate she transferred on September 11, 1847, to James P. Dumas. On September 20, 1859, he located the certificate on the land in controversy, receiving from the then county surveyor of Tarrant county duly-certified field notes, which were filed in the general land office on October 1, 1859. The land is situated in a part of the country that is described as "wild prairie land," and appears to have been vacant public domain, surrounded by prior locations and surveys which had been projected according to the system which obtained in Texas, with nothing tangible to mark the lines dividing them from this un-located portion of the public domain. The first field notes of the survey of the location of the land in controversy called to begin at a stake the southeast corner of a previous survey, and thence call-ing for a stake in different lines and corners of the numerous sur-rounding surveys, without any call for natural objects or permanent tangible marks. On December 8, 1869, the county surveyor certi-fied to a correction of the field notes of this survey, which certificate was filed in the general land office January 4, 1870. On April 25, 1871, the then county surveyor certified to second corrected field notes of this survey, which were filed in the general land office, May 8, 1871. Third corrected field notes appear to have been made by the then surveyor of the county on September 18, 1873, and filed in the general land office on September 26, 1873. On December 19, 1871, the commissioner of the general land office issued a certificate for the unlocated balance of the Gonefacio Herrera certificate of 1,280 acres of land, said unlocated balance being for 1,164 acres to be located, 116 acres of other land having been located under the original certificate. This action of the commissioner appears to have been predicated upon some verbal communications between Hon. J. D. George, then a member of the legislature, and the commissioner, touching the Her-rera certificate. The certificate for unlocated balance was sent by mail to the owner of the Herrera certificate, J. P. Dumas, who promptly returned it by mail, in a letter to the commissioner of the land office dated January 10, 1872, in which he claimed that his cer-tificate was located, that he did not wish to abandon the location, that he had not abandoned it, that he had authorized no person to suggest that he had, and asking that the certificate for the unlocated balance thus issued without authority be canceled, and a patent issue to him on the last corrected field notes, and that there be issued to him an unlocated balance for about 70 acres, unexhausted by this location. The commissioner, declining, again sent the unlocated bal-ance certificate by mail to Mr. Dumas, who lived in Grayson county, 75 miles from the land in controversy. On getting this last advice from

the general land office, Dumas wrote to J. P. Smith, Esq., then and now an attorney at law in Tarrant county, Tex., who had then, and has had since, much to do with locating lands, inclosing the unlocated balance certificate, advising him of the situation, and requesting him to take the proper steps to secure his right to the land. Dumas owned a large quantity of land in Tarrant county, and Smith represented him as agent and attorney in his interests, and had procured to be made the corrected survey that was made on the 25th of April, 1871, by J. H. Smith, deputy surveyor of Tarrant county, a brother of J. P. Smith, and had forwarded the field notes as corrected to the general land office. The letter of Dumas to Smith containing the certificate for the unlocated balance was received by Smith in February or March, 1872. On November 28, 1872, parties representing the owners of the Madison Leedy certificate, admitted to be a genuine land certificate, located the land in controversy under that certificate. Their location was recognized by the commissioner of the general land office, and a patent was issued thereon to Madison Leedy, his heirs and assigns, dated the 27th of May, 1873, of which the appellants are the lawful assignees. Up to this time, and for several years afterwards, there was no actual occupation of the land by any one.

Some time in January, 1875 (the exact date is not fixed), Dumas brought suit in the state court, in Tarrant county, against A. G. Leedy and others, who were claiming under the Leedy certificate and patent, to quiet his title, and to have the patent canceled. Madison Leedy had died before the Leedy certificate issued, and more than 30 years before the patent issued. There appears to have been some difficulty in ascertaining correctly the names and residences of all of the parties interested in the certificate and patent. On the 1st day of February, 1875, James P. Dumas died. At the March term, 1876, the death of Dumas was suggested, which operated a continuance; and, for one cause or another, the suit did not come to trial before March 29, 1876, on which date the court house was burned, and most of the records, and all the files in the suit of Dumas against A. G. Leedy, were destroyed by that fire. The case was continued at the August term, 1876, to make parties, and to substitute the record. At the March term, 1877, it was continued to substitute the record. The records were not substituted; and on August 27, 1877, it appearing to the court that the plaintiff had used no diligence to substitute the papers and pleadings, the case was dismissed. On January 1, 1882, the appellee, M. A. E. Dumas, took possession of the land in controversy by her lessees, Brown & Kemper, and has held possession of the whole land continuously since that date. There had been no previous possession by any one, and there has been no conflicting occupation by any one since then. On March 25, 1885, Harry W. Ogden filed in the circuit court of the United States, for the Northern district of Texas, a real action at law, against the appellee and the appellants, to try the title, and recover possession of the property in controversy. To stay this action at law, to establish appellee's title, and to cancel the patent issued on the Leedy certificate, this bill was exhibited. At the hearing, the circuit court found that the bill was fully sustained by the proof and the law applicable thereto, and

passed its decree granting the appellee, M. A. E. Dumas, the relief she sought. Ogden declined to appeal. The appellants, William Thompson and Jefferson Clevenger, procured an order of severance, and were allowed to appeal, and have assigned numerous errors, the substance of all of which is, however, that the court erred in passing its decree: (1) Because the proof establishes their contention that Dumas had abandoned his location of the Herrera certificate on the land in controversy, and that, consequently, the land was vacant, and subject to location of the Leedy certificate, under which they claim; and (2) if the complainant (the appellee) ever had an equitable right to the land, she had lost it by her laches, and her demand was stale at the time she exhibited her bill.

The assignments of error assume that previous to the location of the Leedy certificate, November 28, 1872, the land in controversy was vacant public domain of the state of Texas. The record in this case does not show anything to the contrary of this assumption, except the claim of the appellee, who deduces her right from a location made by her husband on this land in September, 1859. As between these parties, therefore, it may be safely assumed that the land in controversy was vacant public domain of the state of Texas, in September, 1859. The genuineness of the Herrera certificate, and J. P. Dumas' ownership thereof, is not questioned. It clearly appears that the first field notes returned by the county surveyor of Tarrant county of the survey made on the location of the Herrera certificate, and certified to on the 20th of September, 1859, embraced the land in controversy. There is nothing to show that there was any suggestion on the part of any one, or any knowledge on the part of any one, that the field notes thus and then returned to the land office conflicted with any adjacent surveys, until December 8, 1869, when the first corrected field notes were certified, and subsequently, on January 4, 1870, filed in the general land office, which correction shows that the vacancy located upon did not contain 1,164 acres, and that the field notes of adjoining surveys required some correction in the course and distance of certain lines called for in the original survey. When these corrections were applied in the general land office, it appeared that they did not relieve the survey made under the Herrera certificate from a partial conflict with certain of the surrounding surveys, and hence the field notes were not in a shape to be carried into a patent for the land, of which memorandums were made in the land office, and the owner of the survey was notified by letter of the commissioner of the general land office, of date July 15, 1870. Second corrected field notes were certified April 25, 1871; and third corrected field notes resurveyed September 16th and 17th, and certified the 18th of September, 1873. Locations of land in Texas were made in the office of the county surveyor or of a district surveyor. These officers held for short terms, and, being chosen by popular election, changes of the incumbent frequently occurred. Great difficulty had been experienced up to October, 1871, in obtaining correct or correctly corrected field notes of surveys made for parties making locations under genuine certificates; so much so that on the 24th of October, 1871, the legislature provided by statute

that, when field notes of surveys of land are returned to the general land office with application for patents, it shall be the duty of the commissioner to cause an examination of the same without unnecessary delay. If, upon examination, the field notes are found to be incorrect, it shall be the duty of the commissioner of the general land office to cause a plain statement of the errors, with a sketch of the map, to be forwarded by mail, or by the parties interested, to the surveyor who made the survey, with requisitions to correct the same, and return corrected field notes to the general land office. That law provided further:

"It is hereby made the duty of surveyors, who shall make and deliver incorrect field notes, upon the requisition of the commissioner of the general land office, provided for in section 1, or of the party interested, to make corrected field notes, and return the same to the general land office without delay, without any additional compensation." Laws 1871, p. 12.

These provisions of the statute seem clearly to imply, and the nature of the case and the general system of making locations in Texas as clearly show, that it was the duty of the land office and the surveyor's office to make corrected field notes embracing the land located upon by the holder of a genuine certificate who applied for a location on vacant public domain, and paid or tendered the fees prescribed by law. It clearly appears that, at the time this law was passed, Dumas was using all reasonable exertions to get the county surveyor of Tarrant county, and the surveyor himself was using all reasonable exertions to make the required correction of the field notes of the survey originally made on the Dumas location of the Herrera certificate on the land in controversy. All the proof supports the conclusion that Dumas was making strenuous efforts to obtain in 1872 a patent to the land upon which he had located the certificate in 1859; that these efforts had been continuous from July 4, 1870, when he made his first application to Jacob Keuchler, commissioner of the land office, for patent or a statement in reference to this location. There is nothing in the memorandum that he gave Hon. J. D. George, or any of the letters that he is shown to have written to the commissioner, to indicate any intention or wish to abandon the location, but everything to the contrary. The testimony of George is clear to the effect that he had no authority from Dumas, either verbal or written, to suggest to the commissioner or any one in the land office that Dumas had abandoned, or wished to abandon, or intended to abandon, his location made in 1859. The then commissioner, in his testimony now as a witness, is naturally not able to recall any verbal suggestion, but concludes from what was done in the land office that some such suggestion must have been made,—a conclusion which we think is not only not supported, but is fully refuted by all the proof in the case.

Prior to the act of August 30, 1856, it had been much the practice to lift and float certificates in the surveyors' offices in Texas, and, though the practice had grown into a great abuse, it had become so general, and so many rights had grown up and depended upon it, that the courts could not disturb it; and it was therefore provided in that act in what manner locations should be made, and that there-

after it should not be lawful for a county surveyor to allow the holder of any land certificate to lift or float the same after entry when the same is not made upon land previously appropriated; but when there is a conflict of entries, upon a proper showing of the facts, which may be made by the certificate of one of the surveyor's deputies, or from his own knowledge, he shall allow the party having his entry of subsequent date to lift so much thereof as shall be affected by such conflict. It was under this provision of the law that Dumas, in his letter of January 10, 1872, to the commissioner of the general land office, asked for his patent to the land embraced in corrected field notes of the survey under his location, and for an unlocated balance for the 70 acres or thereabouts, being the excess in the number of acres embraced in the certificate over the number of acres embraced in the corrected survey of the location. We must conclude, therefore, that the circuit court did not err in holding that the proof established the fact that Dumas had not abandoned the location which he made and procured to be surveyed on this land in 1859, and that this location and survey vested in him and his heirs from that date the vacant land embraced in the original field notes of his survey. By a provision of the act of the 5th of February, 1841, which is still in force, such location and survey vested in the owner of the certificate sufficient title to the land to authorize the maintenance of actions of ejectment, trespass, or any other legal remedy given by law, all laws to the contrary notwithstanding. The last clause has reference to the common law, which had then but recently been adopted.

The location of the Leedy certificate was therefore made on land that was not vacant or subject to location, and, as against the owner of the location and survey under the Herrera certificate, the parties claiming under the patent issued on the location of the Leedy certificate do not show title that could prevail in the Texas courts, or a superior equity that would enable them to prevail in the courts of equity of the United States. The appellee, having gone into quiet, peaceable, exclusive possession of the land under a title thus paramount, which did not need actual possession of the land to strengthen the title, and retaining undisturbed exclusive possession that could not be disturbed by any suit in the local courts whose peculiar province and jurisdiction it was to settle and assure title to land (which jurisdiction, as between domestic parties, was exclusive), cannot reasonably be charged with laches for not applying to a court of equity of the United States to quiet her title or to cancel the junior patent, until she, at least, had accurate knowledge that some person entitled to sue in the United States court was claiming under the patent. This knowledge she obtained when Ogden brought his action at law. It appears that thereupon the parties agreed between themselves that, without any regard to the distinction of law and equity, the United States circuit court should hear and determine the whole controversy between the parties, and, under this agreement, that action proceeded until it was ready for trial, when the judge of the circuit court declined to proceed under that agreement, and the appellee (one of the defendants in the action at law) was

allowed to present her case by a bill in equity to the circuit court. It does not appear to us that at any stage in the progress of this controversy the appellee has been guilty of laches, or that any ground has been shown to refuse her relief because of any staleness in her demand. It appears to us that, from the very first, the parties locating the Leedy certificate, and their privies, had, on the very day that location was made, notice of the title under which appellee claims, and have had continually since that time, in every way that appellee could give it, notice of her persistence in her claim of right, and of all acts that she has done to maintain the same. We conclude that there was no error committed by the circuit court in passing its decree in this case in favor of the appellee. That decree is therefore affirmed.