# GARFIELD *v.* UNITED STATES EX REL. FROST.

### INDIANS; MANDAMUS.

Where a duly enrolled member of the Chickasaw Indian tribe, entitled to share in the allotment of tribal lands, selected a 40-acre tract, upon which she made improvements, and applied to the tribal commission for a certificate of allotment, which was regularly issued to her after the expiration of the time limited for contest, no contest having been made; and thereupon a patent to her was duly executed by the proper authorities; but, before registration and delivery, it was, by order of the Secretary of Interior, transmitted to him, and he refused to deliver it to the patentee, stating it to be his intention to cancel it and to permit the relator to make another selection of land and to add the land covered by the patent to an existing town site,—it was *held,* in proceedings by mandamus to compel the delivery of the patent to the relator, upon a review of the several statutes relating to the allotment of such lands and reservation of town sites, that the relator's right to the land had become vested, and that it was the Secretary's duty to deliver the patent to her, and that the delivery thereof was a mere ministerial act which could be enforced by mandamus.   (Following *United States ex rel. West* v. *Hitchcock,* 19 App. D. C. 333.)

No. 1804. Submitted October 29, 1907. Decided November 29, 1907.

HEARING on an appeal by the Secretary of the Interior from an order of the Supreme Court of the District of Columbia, sustaining a demurrer to the answer to the petition for a writ of mandamus, compelling the delivery of a patent of land. *Affirmed.*

The COURT in the opinion stated the facts as follows:

Relator, Belle Frost, filed her petition in the supreme court of the District of Columbia against Ethan Allen Hitchcock, then Secretary of the Interior, praying a writ of mandamus ordering him to deliver to her a certain patent of 40 acres of land,

part of the lands of the Choctaw and Chickasaw Indians, in the Indian Territory, that had been executed to her by the principal chief of the Choctaw Nation and the governor of the Chickasaw Nation, and was withheld from her by the Secretary. Secretary Hitchcock made answer by way of return to the preliminary order, but retired from office while the litigation depended, and his successor, James R. Garfield, was by order made party respondent in his stead. The case was submitted upon demurrer to the answer. This was sustained, and, the respondent electing not to amend, a final order was entered from which this appeal has been prosecuted, directing the writ to issue as prayed.

The determination of the correctness of this order depends upon the effect of certain acts of Congress providing for and regulating the allotment and disposition of the lands of the Choctaw and Chickasaw Indians, in the Indian Territory.

These acts are voluminous, and as, in the main, their purport is not disputed, we will state such of their requirements as are pertinent to the facts which clearly appear in the admissions of the answer to the petition, and the demurrer to that answer.

Section 29 of the act approved June 28, 1898 (30 Stat. at L. 495, 505 et seq. chap. 517), declares that the lands belonging to the Choctaw and Chickasaw Indians shall be allotted to the members of said tribes in fair and equal proportion, as afterwards specified, exempting therefrom all town sites (and some other lands not important to mention here), and providing that the appraisement and allotment shall be made under the direction of the Secretary of the Interior. It further provides that, as soon as practicable after the completion of the said allotments, the principal chief of the Choctaw Nation and the governor of the Chickasaw Nation shall jointly execute, under their hands and the seals of the respective nations, and deliver to the allottees, patents conveying to them all the right, title, and interest of the said Indians in and to the lands which shall have been allotted in accordance with the requirements of the agreement contained in the act.

This act also made a regulation as to allowances for improve-

ments and purchase of lots by occupants in the town sites that had been reserved when laid out, etc.

The act of May 31, 1900 (31 Stat. at L. 221 et seq. chap. 598), authorized the Secretary of the Interior, under rules and regulations to be prescribed by him, to lay out, survey, and plat the sites of such towns as then had a population of 200 or more, in such manner as will best subserve the then present needs and the reasonable prospective growth of such towns; and he was empowered to appoint a separate town-site commission for any town. He was also empowered to permit the authorities of any town, at their own expense, to survey, lay out, and plat the site thereof. It was further provided that he might, upon the recommendation of the Commission to the Five Civilized Tribes, *at any time before allotment,* set aside and reserve from allotment not exceeding 160 acres in any one tract at such stations as are or shall be established, in conformity with law, on the line of any railway which shall be constructed, or in process of construction, in or through either of said nations prior to the allotment of the lands therein. If such land be occupied by a member of the tribe, compensation shall be made to each member under rules and regulations to be prescribed by the Secretary. These town-site provisions and those of the act of 1898 were also incorporated into the act of March 1, 1901 (31 Stat. at L. 861 et seq. chap. 676).

The land in controversy adjoins the town site of Mill Creek, in which there is a railway station, which was designated and laid out October 26, 1900, and contains 155.45 acres.

In this connection, it is convenient to the understanding of the appellant's case to state a further provision relating to town sites contained in the last acts that are to be further considered. Sec. 46 of the act of July 1, 1902 (32 Stat. at L. 641 et seq. chap. 1362), declares that as to town sites hereafter set aside on the recommendation of the Commission to the Five Civilized Tribes, as provided in the act of May 31, 1900, such additional acreage may be added thereto, in like manner as the original town site had been set apart, as may be necessary for the present needs and reasonable prospective growth of said towns, not to

exceed 640 acres. Sec. 47 is an additional provision to the same effect. Section 48 provides for compensation, to any member of the tribe occupying such land, for improvements.

The appropriation act of March 3, 1903 (32 Stat. at L. 982, 996, chap. 994), appropriated $25,000 to pay town-site expenses, with the proviso "that the money hereby appropriated shall be applied only to the expenses incident to. the survey, platting and appraisement of town sites heretofore set aside and reserved from allotment: *And provided further,* that nothing herein contained shall prevent the survey and platting, at their own expense, of town sites by private parties, where stations are located along the lines of railroads, nor the unrestricted alienation of lands for such purposes, when recommended by the Commission to the Five Civilized Tribes and approved by the Secretary of the Interior."

For a long period of time, relator had been living upon the land adjacent to Mill Creek town site, having improvements thereon. It appears from the answer of the Secretary that after Mill Creek town site had been laid off, as aforesaid, and prior to May 17, 1903, urban settlement had extended to the adjacent lands; and on that day the Commission to the Five Civilized Tribes made a recommendation to the Secretary that this adjacent land be segregated as an addition to Mill Creek under the provisions of the act of July 1, 1902 (before mentioned). They reported that the town was rapidly growing, that the adjacent lands were occupied by residences, and much needed for town-site purposes. This recommendation, having been approved by the Commissioner of Indian Affairs, was by him transmitted, in due course, to the Secretary of the Interior. With this recommendation before him, the Secretary, on March 18, 1903, addressed a letter to the Commission, reciting the segregation of Mill Creek town site on October 26, 1900, and the recommendation of the Commission approved by the Commissioner of Indian Affairs, and said: "The Department does not deem it advisable to make the recommendation, in view of the act of March 3, 1903," which provides that the $25,000 appropriated thereby be applied to the expense incident to the

survey of town sites heretofore set aside under secs. 15 and 29 of the act of June 28, 1898, and acts supplemental thereto. The provision of the act of March 3, 1903, which permits the platting of additions to town sites by private parties at their own expense is copied in the letter. No further action was recommended or taken in respect of this desired addition to Mill Creek.

We return now to the provisions of the act of July 1, 1902 (32 Stat. at L. 641 et seq. chap. 1362), relating to the completion of allotments on which, in addition to those of former acts before recited, the case of the relator rests. Sec. 11 of that act declared that there shall be allotted to each member of the Choctaw and Chickasaw tribes, as soon as practicable after the approval by the Secretary of the Interior of his enrolment, land equal in value to 320 acres of the average allottable lands of said tribes, which may be selected by each allottee so as to include his improvements. Another section provides that no certificate shall issue until after nine months from application, during which time contests may be made. On account of their importance secs. 23 and 24 are recited in full as follows:

"Sec. 23. Allotment certificates issued by the Commission to the Five Civilized Tribes shall be conclusive evidence of the right of any allottee to the tract of land described therein; and the United States Indian agent at the union agency shall, upon the application of the allottee, place him in possession of his allotment, and shall remove therefrom all persons objectionable to such allottee; and the acts of the Indian agent hereunder shall not be controlled by the writ or process of any court.

"Sec. 24. Exclusive jurisdiction is hereby conferred upon the Commission to the Five Civilized Tribes to determine, under the direction of the Secretary of the Interior, all matters relating to the allotment of land."

"Sec. 66 provides that all patents when executed shall be recorded in the office of the Commission to the Five Civilized Tribes in books appropriate for that purpose, until such time as Congress may make further provision, and without expense to the grantees. These records are given the same effect as other

public records.  Sec. 71 reads as follows: "Sec. 71. After the expiration of nine months after the date of the original selection of an allotment by or for any citizen  *  *  *  of the Choctaw or Chickasaw tribes, as provided in this agreement, no contest shall be instituted against such selection."  The last act relating to the subject, approved April 26, 1906 (34 Stat. at L. 137, chap. 1876), provides for the final closing of the rolls on or before March 4, 1907.  Sec. 5 of the same declares that all patents to allottees shall be recorded in the office of the Commission, "and when so recorded shall convey legal title, and shall be delivered, under the direction of the Secretary of the Interior, to the party entitled to receive the same."  Other sections provide for the removal of the principal chiefs who shall refuse or neglect to execute patents, and the approval of such patents without execution by them.

It is admitted that relator was a Chickasaw Indian; that she was and had been living for a considerable period in her house on the land in controversy; that she was regularly enrolled as a member of the Chickasaw tribe, entitled to participate in the allotment of the lands, in accordance with the provisions of the acts aforesaid; and that her enrolment had been duly approved by the Secretary of the Interior.  It was further admitted that on July 23, 1903, relator selected the land in controversy, containing her improvements, as her allotment.  This was received by the Commission, and nine months thereafter, there having been no contest of her right to the designated allotment, a certificate of allotment was issued and delivered to her.  Thereafter the principal chief of the Choctaw Nation and the governor of the Chickasaw Nation jointly executed a patent, under the seal of their respective nations, conveying to her the title of said nations in and to said 40 acres of land.  It does not appear what were the rules and regulations of the Secretary of the Interior respecting the proceedings of the Commission in the matter of administering the laws relating to the Indian lands, but it is conceded that the procedure respecting relator's allotment was in general accordance therewith  After the execution of the patent, and before registration and delivery, . the Secretary

ordered the same to be transmitted to him.   He has refused to deliver it, and has stated his intention to cancel it, and permit relator to make another selection in lieu thereof.

The Secretary, claiming a general power of supervision of the administration of these Indian lands, states the reasons for withholding and canceling this patent substantially as follows: About March 11, 1905, the Secretary was advised that the land contiguous to Mill Creek town site, including relator's allotment, had been under what is called "urban occupancy," meaning thereby that town settlers had established themselves in houses thereon from time to time.   It is not claimed that these settlers were members of the said tribes.   On June 19, 1905, he caused this report to be investigated, and it appeared that there were such settlers occupying valuable improvements.   October 23, 1905, he ordered the lands segregated as an addition to the town site, and the cancelation of relator's patent, with permission to her to make selection of other lands.   This was done in recognition of and for the protection of the equitable rights of the aforesaid occupants.

The Secretary claims that he is vested with these powers under his interpretation of the statutes relating to the Indian lands; and that such interpretation involves the exercise of discretion, and is therefore beyond the power of the courts to control.

The contention of the relator is that her allotment having been made and her patent executed by the proper authorities provided by law, the Secretary of the Interior was invested with no power to withhold her patent, and it was his plain duty to deliver it to her.

*Mr. George W. Woodruff,* Assistant Attorney General, Interior Department, and *Mr. Joseph R. Webster,* Assistant Attorney, Interior Department, for the appellant.

*Messrs. Kappler & Merillat* and *Potter & Walker* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

We regard it as unnecessary to review the many decisions relating to mandamus against a public officer, that have been cited on the argument. The law, as said by Mr. Justice Peckham, "is well settled in the abstract, the only doubt which arises being whether the facts regarding any particular case bring it within the law which permits the writ to issue where a mere ministerial duty is imposed upon an executive officer, which duty he is bound to perform without any further question. If he refuse under such circumstances, mandamus will lie to compel him to perform his duty." *Roberts* v. *United States,* 176 U. S. 221, 229, 44 L. ed. 443, 446, 20 Sup. Ct. Rep. 376.

In this case there were no facts necessary to be ascertained by the Secretary in the performance of his duties. With his approval, the relator had been enrolled as a member of the tribe entitled to an allotment of land. All the steps under the law and his regulations prescribing the procedure in accordance therewith had been taken with due regularity, and ended in the execution of the patent by the persons charged with that duty. This patent, passing into the possession of the Secretary, has been withheld by him with the declared intention to cancel it and segregate the lands embraced in it, to be laid out as an addition to the railway town site of Mill Creek, upon the assumption that such power had been conferred on him by the several statutes relating to the allotment of the Choctaw and Chickasaw Indian lands. It is not contended that power to that end has been expressly conferred by the statutes, but is claimed under his construction of them, and that the necessary construction of the statutes in the performance of his duty required the exercise of judgment and discretion.

Undoubtedly there are many cases in which, when a public officer is called upon to perform an official act as a duty, the interpretation of statutory provisions relating thereto would require the exercise of judgment to such an extent as to take his decision out of the category of a mere ministerial act. *Unit-*

*ed States ex rel. Dunlap* v. *Black,* 128 U. S. 40, 32 L. ed. 354, 9 Sup. Ct. Rep. 12, and cases therein cited and discussed.

The particular decision which, in that case, the court refused to control by mandamus, was one that had been made by the Commissioner of Pensions upon an application by a pensioner for an increase. He had to determine the right by the construction of some confusing provisions of different acts that had been passed from time to time relating to the increase of pensions upon many grounds. He had not only to construe the meaning of particular provisions, but the effect also of later acts upon the former ones. This was held to require something more than the performance of a mere ministerial duty. The broad proposition that, because courts are vested with no special appellate power in such cases, they will not interfere by mandamus with executive officers in the performance of their official duties in any case where those duties require an interpretation of the law, has been expressly denied in the recent case of *Roberts* v. *United States,* 176 U. S. 221, 231, 44 L. ed. 443, 447, 20 Sup. Ct. Rep. 376.

It was said in that case: "Every statute to some extent requires construction by the public officer whose duties may be defined therein. Such officer must read the law, and he must therefore, in a certain sense, construe it in order to form a judgment, from its language, as to what duty he is directed by the statute to perform. But that does not necessarily and in all cases make the duty of the officer anything other than a purely ministerial one. If the law direct him to perform an act in regard to which no discretion is committed to him, and which, upon the facts existing, he is bound to perform, then that act is ministerial, although depending upon a statute which requires, in some degree, a construction of its language by the officer. Unless this be so, the value of this writ is very greatly impaired. Every executive officer whose duty is plainly devolved upon him by statute might refuse to perform it, and when his refusal is brought before the court he might successfully plead that the performance of the duty involved the construction of a statute by him, and therefore it was not minis-

terial, and the court would on that account be powerless to give relief. Such a limitation of the powers of the court, we think, would be most unfortunate, as it would relieve from judicial supervision all executive officers in the performance of their duties, whenever they should plead that the duty required of them arose upon the construction of a statute, no matter * * * how plainly they violated their duty in refusing to perform the act required."

In the light of the foregoing doctrine, we are of the opinion that the Secretary's decision in respect of his powers, under the admitted facts of this case, did not require the exercise of judgment to such an extent as to place his action beyond the control of the court by mandamus. There were several statutes relating to the allotment of the Indian lands and the reservation of town sites, but there was no conflict between them and no confusion in their application. Later acts expressly re-enacted the provisions of former ones, that are relevant to the facts presented. As a matter of fact, there was no occasion to construe these acts at all, in order to perform the final act demanded of the Secretary, namely, the delivery of the patent. In so far as the relator's rights are involved, all the requirements of the statute have been fully and regularly performed. Whatever power of direction, supervision, or approval has been conferred upon the Secretary in respect of the allotment of the Indian lands, making regulations therefor, and the reservation of town site, had been completely exhausted so far as the relator's allotment was concerned. His official duties had been performed. It is admitted that he had approved the relator's enrolment as a member of the tribe entitled to an allotment of land; that she was in possession of the land selected by her, and made her application to the proper tribunal in regular form; and that after the expiration of the nine months permitted for contest of her application, none having been made, she had received her certificate of allotment. The statute made this certificate conclusive evidence of her right to the land, entitled her to have the Indian agent remove all persons therefrom that were objectionable to her, and declared that his acts in so

doing shall not be controlled by the process of any court. Relator's right to the land became vested, and the execution and delivery of the patent—the evidence of her legal title—were ministerial acts. *Barney* v. *Dolph,* 97 U. S. 652, 24 L. ed. 1063; *Simmons* v. *Wagner,* 101 U. S. 260, 261, 25 L. ed. 910, 911; *United States* v. *Detroit Timber & Lumber Co.* 200 U. S. 321, 325, 50 L. ed. 499, 501, 26 Sup. Ct. Rep. 282.

The patent to which relator was entitled under the certificate of allotment was in fact executed by the parties charged with that duty by the express terms of the statute. This patent passed into the hands of the Secretary, whose duty was to deliver it to the relator, as the statute conferred no power upon him to review the acts of the Commission, or to set aside the patent. *United States* v. *Schurz,* 102 U. S. 378, 395, 26 L. ed. 167, 171; *United States ex rel. West* v. *Hitchcock,* 19 App. D. C. 333, 344.

The contention, then, in support of the right to recall and vacate the patent and the certificate of allotment is reduced substantially to this: Under his construction of the statutes, the Secretary holds that the certificate and patent are not conclusive, and that his authority to segregate the land embraced therein as an addition to the Mill Creek town site remains unimpaired thereby. Undoubtedly the statutes had authorized the Secretary to set aside land for town sites, and he had repeatedly so done. The town site of Mill Creek was laid out and set apart as one of those along railway lines constructed or in process of construction. It is unimportant to consider the power of the Secretary, of his own motion, to make additions to the town site, as it is not pretended that he had exercised any such power. The act of March 31, 1900, heretofore recited, authorized the Commissioner to the Five Civilized Tribes to recommend the reservation of additions to such town sites as Mill Creek, and this might be done "at any time before allotment." Before allotment such a recommendation was made and transmitted to the Secretary. Had he given it his approval, no selection of the land would have been entertained, and no allotment of it could have been made. Instead of approving, he disapproved, the

recommendation, thereby ending its efficacy. Grant that, as indicated in his notice of disapproval, private parties interested in the extension of the town site might have procured from the Secretary an order for the reservation and the incorporation of the additional lands before their allotment; but no action was taken by them. Some time after this disapproval and the failure of action by private parties, the relator selected the land, as she had the right to do. Her selection and application depended before the Commission for the nine months provided for objections to and contest of the right to the certificate of allotment. Throughout this period no reservation of the land for a town site was recommended or applied for, and there was no contest of the relator's right. The certificate, declared by the statute conclusive evidence of the passage of the tribal right, was regularly issued, and the patent followed.

Afterwards the Secretary concluded that the recommendation for additional town sites ought to have been approved and the land reserved as an extension, in the interest of the town and the "urban occupants;" and from a natural desire to protect what he conceived to be the equitable rights of these occupants, he has examined the statutes, and from their construction decided that he has the power to cancel the patent and allotment, and thereafter convert the land into a town site.

In our opinion, the statutes are plain, and admit of no room for construction. Believing that the Secretary's power in the premises ended with the issue of the certificate of allotment and the patent, we think that he has no power to hold the patent for cancelation, and that it is his plain duty to deliver it to the relator.

The judgment will therefore be affirmed, with costs. It is so ordered.                                              *Affirmed.*

A writ of error to the Supreme Court of the United States was allowed December 13, 1907.