## BARNEY v. DOLPH.

After the passage of the act of July 17, 1854 (10 Stat. 306), amendatory of the
act of Sept. 27, 1850 (9 id. 496), commonly known as the Donation Act, a
husband and wife, who, by reason of their residence and cultivation, were,
under the latter act, entitled to a patent from the United States for land in
Oregon, could, before receiving such patent, sell and convey the land, so as
to cut off the rights of his or of her children or heirs, in case of his or her
death before the patent was actually issued.

ERROR to the Supreme Court of the State of Oregon.

Ejectment by Dolph against Barney, for certain land in Polk
County, Oregon, on which John Waymire, a married man, set-
tled, under sect. 4 of the Donation Act of Sept. 27, 1850 (9 Stat.
496), and which he and Clarissa his wife, after they had made
and filed in the proper office the requisite final proof of settle-
ment, continued residence, and cultivation, conveyed in fee by
a quitclaim deed, bearing date Dec. 9, 1867, to one Riggs, under
whom Dolph proved title.

Said Clarissa died before the issue of the patent. After its
issue, said John executed a deed for the land to Barney, to
whom, on the same day, Mary, a daughter of said John and
Clarissa, also conveyed her interest in the land.

After Dolph had closed his case, Barney offered in evidence
the deeds so executed to him; but upon Dolph's objection,
the court excluded them, upon the ground that, by the deed to
Riggs, said John and wife, then having full power of aliena-
tion, transferred the whole title to the land, and that no inter-
est therein passed on her death to said John or said Mary. To
this ruling Barney excepted. There was a verdict for Dolph;
and the judgment rendered thereon by the Circuit Court for
that county having been affirmed by the Supreme Court, Barney
removed the case here, and assigns for error that the latter court
erred in sustaining the ruling of the Circuit Court.

*Mr. George H. Williams* for the plaintiff in error.
*Mr. J. H. Mitchell, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the
court.

The only question within our jurisdiction presented by this

record is, whether after a husband and wife had perfected their right to a patent for lands in Oregon, under the Donation Act of Sept. 27, 1850 (9 Stat. 496), and after the amendment of July 17, 1854 (10 id. 306), they could, before receiving the patent, sell and convey the lands so as to cut off the rights of the children or heirs of the husband or wife, in case of his or her death before the patent was actually issued.

This depends upon the effect to be given the original act, when construed in connection with the amendment. The original act, after providing for a grant to the husband and wife of six hundred and forty acres of land, one-half to the husband and one-half to the wife in her own right, declared that, "in all cases where such married persons have complied with the provisions of this (the) act, so as to entitle them to the grant as above provided, whether under the late provisional government of Oregon, or since, and either shall have died before patent issues, the survivor and children or heirs of the deceased shall be entitled to the share or interest of the deceased in equal proportions, except where the deceased shall otherwise dispose of it by testament, duly and properly executed according to the laws of Oregon;" and then "that all future contracts by any person or persons entitled to the benefit of this act, for the sale of the land to which he or they may be entitled under this act before he or they shall have received patent therefor, shall be void." The amendment of 1854 repealed this prohibition of sales.

The point to be decided is not whether, before the amendment, such a conveyance could have been made, or whether, if the conveyance had not been made, the children or heirs of a deceased husband or wife would take by descent or purchase, or whether the grant from the United States was one which took effect from the time of the passage of the act, or a subsequent entry and settlement, but whether, after the amendment, the husband and wife held by such a title that, before patent, but after their right to one had become absolute, they could sell and convey so as to vest in the purchaser either a legal or an equitable estate in fee-simple, — legal, if the title had already passed out of the United States by virtue of the act of Congress, and a full compliance with its provisions;

equitable, if the patent was needed to perfect the grant. The question is one of legislative intent, to be ascertained by examining the language which Congress has used, and applying it to the subject-matter of the legislation.

The reason of the exceptional policy of the United States in respect to the public lands in Oregon is to be found in the anomalous condition of the inhabitants of that Territory when the government of the United States exerted positively its jurisdiction over them. For more than thirty years, under the operation of treaty stipulations between the two countries (8 Stat. 249 and 360), the citizens of the United States and the subjects of Great Britain had been permitted to occupy jointly the territory afterwards included in that State. They had no government except such as they had organized "for the purposes of mutual protection and to secure peace and prosperity among" themselves. The actual condition of affairs is graphically described in *Lownsdale* v. *City of Portland* (Deady, 11), by the able and experienced judge of the district of Oregon, who has been connected with the administration of justice there for more than a quarter of a century, and was considered by this court in *Stark* v. *Starrs*, 6 Wall. 402, *Lamb* v. *Davenport*, 18 id. 307, and *Stark* v. *Starr*, 94 U. S. 477. As part of their plan of government, they established a "land law," by which free males over the age of eighteen years were permitted to occupy and hold six hundred and forty acres of land; and regulations were adopted for designating claims and protecting the occupants in their possession. While not denying to the United States the ownership of the soil, the occupants, to all intents and purposes, used and dealt with the lands they severally claimed as their own.

Finding this to be the condition of affairs, and recognizing the equitable claims of the inhabitants, Congress, within two years from the time of the organization of the territorial government, passed the Donation Act, which was framed so as to conform in a large degree to the regulations of the old system, and to grant to the original settlers holding under that system the whole, or a considerable portion, of the lands they had been occupying and cultivating. Sect. 4 was evidently intended for the special benefit of this class, and, stripped of details, in

effect granted to the white settlers then residing in the Territory, over eighteen years of age and citizens of the United States, or intending to become such, a half-section of land if single, or a whole section if married, — one-half to the husband and one-half to the wife, — provided they had resided upon and cultivated the land, or should do so, for four consecutive years, and otherwise conformed to the provisions of the act. Then follows, in this section, the provision which has already been cited in respect to the disposition of the property in case of the death of one of two married persons after they had complied with the provisions of the act and become entitled to a patent, but before the patent was actually received by them. The language used evidently confines this limitation in its effect to the married persons mentioned in this section.

Sect. 5 made provision for those coming into the Territory and settling after Dec. 1, 1850, and above the age of twenty-one years. It granted them, if single, one hundred and sixty acres, and if married, three hundred and twenty, — one-half to the husband and one-half to the wife, — upon the same conditions of residence, cultivation, and conformity to the act specified in sect. 4. Other sections required the settler, within three months after the survey of the lands had been made, or, if the survey had been made when the settlement commenced, within three months after the commencement of the settlement, to notify the surveyor-general of the precise tract he claimed, and within twelve months to prove to the satisfaction of the same officer that the settlement and cultivation required by the act had been commenced, specifying the time of the commencement. At any time after the expiration of four years from the date of the settlement, whether made under the laws of the late provisional government or not, the settler might prove to the surveyor-general the fact of the continued residence and cultivation required; and that being done, it became the duty of the surveyor-general to issue certificates, setting forth the facts of the case and specifying the land to which the parties were entitled, and to return the proofs taken to the Commissioner of the General Land-Office, when, if no valid objections were found, patents were to issue according to the certificate, upon the surrender thereof.

Sect. 8 provided that, upon the death of any settler before the expiration of the required four years' continued possession, all his rights should descend to his heirs, including the widow, where one was left, in equal parts, and that proof of compliance with the conditions of the act up to the time of the death should be sufficient to entitle them to a patent.

The prohibition of sales, although contained in sect. 4, applied to all persons entitled to the benefit of the act, and its repeal was, under the circumstances, equivalent to an express grant of power to sell. The prohibition was of the sale, before patent, of the land to which the settler was entitled under the act. The repeal, therefore, operated under the circumstances the same as a grant of power to sell the land even though a patent had not issued. This, in the absence of any thing to the contrary, implied the power to convey all the government had parted with.

When the right to a patent once became vested in a settler under the law, it was equivalent, so far as the government was concerned, to a patent actually issued. We so decided in *Stark* v. *Starrs*, 6 Wall. 402. The execution and delivery of the patent after the right to it is complete are the mere ministerial acts of the officer charged with that duty. An authorized sale by a settler, therefore, after his right to a patent had been fully secured, was, as to the government, a transfer of the ownership of the land.

We are thus brought to the consideration of the question, whether such a sale by married persons, entitled to the benefit of the fourth section of the act, would transfer to the purchaser the interest of the children, heirs, or devisees of a husband or wife, who died after the sale, but before the patent was actually received. This depends upon whether the repeal of the prohibition of sales was, in effect, the repeal of the provision in respect to the child, heir, or devisee, in cases where sales were made.

Repeals by implication are not favored; but if there is a positive and irreconcilable repugnancy between the old law and the new, the new must stand and the old fall, even though the result is reached by implication alone. After all, the question is one of legislative intent, to be ascertained

by an examination of both statutes, the rule being that the two are to stand, unless the contrary is manifested beyond a doubt.

As has been seen, the limitation is confined to such married persons as took under the fourth section of the act, where provision is made for those who, in the language of Judge Deady (Deady, 11), "had built towns, opened and improved farms, established churches and schools, and laid out highways," and who, when the United States assumed exclusive governmental control of the Territory, were found "engaged in agriculture, trade, commerce, and the mechanical arts." These, it may fairly be presumed, were special objects of the bounty of the government. The prohibition of sales was undoubtedly intended to protect the United States to some extent against fraudulent claims, and at the same time to place an obstacle in the way of an improvident disposition of their property by the settlers, under the influence of the new order of things; but at all times the husband or wife taking under sect. 4 could cut off a child or heir by will. The prohibition was in respect to sales, and the power to devise was expressly given this class of beneficiaries. It is clear, therefore, that the limitation was not intended altogether for the benefit of children or heirs.

The delay which necessarily attended the delivery of the patents, after settlers had become entitled to them under the law, oftentimes operated with great hardship upon those whom Congress intended to assist. In view of this, after the expiration of nearly four years from its enactment, when the government needed no more time for the detection of frauds, and the people had become accustomed to their change of circumstances, the prohibition of sales was removed, evidently in the interest of the settlers. After this, confessedly, all who had perfected their right to a patent for the lands they had occupied and cultivated for the requisite length of time, other than the married beneficiaries under sect. 4, could sell and convey to the purchaser an indefeasible estate; and there certainly does not seem to be any good reason why these special objects of regard should be made an exception to this general rule. It was a part of the original donation system to keep all the donated

lands from sale until the patents issued, but as soon as the patents were delivered all conditions were withdrawn and all restraints removed. When the settler, whether married or single, became an actual patentee, he could sell and convey in fee. The land was his own, to dispose of as he chose. All that prevented his doing so before, after his right to the patent had been perfected, was the prohibition of sale.

After this prohibition was taken away the system was radically changed, and a perfected right to a patent was made as good as the patent itself for all purposes except the mere convenience of proving title. A grant by Congress, under these circumstances, of the right to sell the land must have been intended to authorize those entitled to patents to convey in the same manner they could if the patent had been actually delivered. Any provision in the act transferring the title of the settler, in case of his death before receiving the patent, to his child, heir, or devisee, is palpably inconsistent with an unlimited power to sell and convey the land. The two cannot stand together, and consequently the power of sale, which was the latest enactment, must prevail. In this connection, it is worthy of remark that the devisee of the settler dying before patent is as much entitled to take under the law as a child or heir. Certainly it could never have been the intention of Congress to allow a settler to defeat a conveyance by a subsequent will. But if the child or heir could take, so must the devisee.

But there is still another argument in favor of the repeal, which is equally cogent. There cannot be a doubt that the great object of the law was to invest the early settlers of that territory with complete ownership of the land they had resided upon and cultivated, while the ownership of the soil was in controversy between the two sovereign claimants. The authority to sell before patent was an additional boon granted by the government. The retention of the original limitation in favor of the children, heirs, and devisees must necessarily affect materially the value of the title which could be conveyed. It operated against no one except married settlers residing in the country on or before Dec. 1, 1850. This would necessarily include those making their claims by reason of possession

taken under the provisional government, and it will not for a moment be presumed that this specially deserving class of settlers were alone to be incumbered by such a restriction on their title.

In conclusion, we hold that the conveyance by Waymire and wife, after they had secured the right to a patent, but before the patent had issued, passed the fee, or an equitable right to the fee, to their grantee, and consequently that there was no error in the court below.

.    *Judgment affirmed.*