## Godfrey v. Iowa Land & Trust Co.

No. 769, Ind. T. Opinion Filed May 20, 1908.

(95 Pac. 792.)

**INDIANS—Seminole Citizen—Conveyance of Allotment—Validity.** A citizen of the Seminole Nation, not of Indian blood, after selecting his allotment and receiving his certificate of allotment from the chairman of the Commission to the Five Civilized Tribes, as provided for by the agreement of the 16th day of December, A. D. 1897, on the part of the Seminole Tribe of Indians, with the United States, ratified by an act of Congress of the 1st day of July, A. D. 1898 (30 Stat. 567, c. 542), after the removal of restrictions on the alienation of allotted land by the members of said tribe, by Act Cong. April 21, 1904 (33 Stat. 204, c. 1402) when no patent has been issued or delivered to such allottee or citizen, may execute a deed or conveyance to that part of his or her allotment not designated by him or her as his or her homestead.

(Syllabus by the Court.)

*Error from the United States Court for the Western District of the Indian Territory, at Muskogee; Wm. R. Lawrence, Judge.*

Action by T. T. Godfrey against the Iowa Land & Trust Company. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

On the 10th day of April, A. D. 1906, the plaintiff in error, as plaintiff in the court below, filed his first amended complaint against the defendant in error, the defendant in said court, seeking to have a certain deed declared a mortgage. Reference herein will be made to the parties as they appeared in the court below. Plaintiff, as a resident of the state of Kansas, alleged that the defendant was a corporation, organized under the laws in force in the Indian Territory, with its principal place of business at Muskogee, and for cause of action stated that, on April 29, 1905, he bought from one Robert James a certain described tract of land, situated in the Seminole Nation, Rebecca James, the wife of said grantor, joining with him in said deed, in executing and delivering a deed with covenants of general warranty conveying to plaintiff said land, which said deed was filed for record in the proper recording district wherein the land was situated, to wit, at Wewoka. A copy of said deed is attached to said complaint, and is in proper form, and contains full and complete covenants of warranty in fee simple. Said Robert James was an enrolled citizen of the Seminole Nation, not of Indian blood, and as such allottee received from the chairman of the Commission to the Five Civilized Tribes certificates of allotment, one bearing date of June 16, 1901, and the other June 28, 1902, describing the land in controversy. Said certificates were attached to said complaint, and identified as proper exhibits.

He further alleges that, prior to the execution and delivery to him of said deed by the grantor, said Robert James conveyed said land to the defendant, the Iowa Land & Trust Company, by an instrument of writing in the shape and form of a deed, for the consideration of $250, and that said instrument bears date of

November 2, 1904, and was executed and delivered by said grantor to the said defendant for the purpose of securing a loan. Plaintiff attaches a copy of said deed to said complaint as a part thereof, and identified same as an exhibit, alleging that said deed was for the purpose of securing borrowed money, and being so understood at the time by all parties thereto, and was intended for the purpose of securing the payment of a note, evidencing a debt for such borrowed money, and that when the plaintiff became the purchaser of said land on April 29, 1905, he purchased the same from said grantor with the understanding that said instrument, in favor of the defendants, was merely a mortgage; and in the settlement between the plaintiff and the said grantor, it was so agreed at the time, and a sufficient sum was reserved by the plaintiff out of the consideration for the payment of said land, to take up the said note held by the said defendant, in order to have cancelled and set aside the deed held by it.

Plaintiff alleges that he has made an effort to settle with the defendant, and that defendant refused to settle for less than $400, which is in excess of the mortgage debt; that he now offers to pay into court, as a tender to defendant, the principal and interest due on the aforesaid loan made by the defendant to Robert James. Plaintiff further alleges that the said Robert James, the grantor in plaintiff's deed, is a citizen of the Seminole Nation, not of Indian blood, and it is further alleged that no patent has been issued and delivered to him by the Principal Chief last elected by the Seminole Tribe, as provided in the Seminole agreemnt of December 16, 1897; that no patents have been delivered and executed, by said Principal Chief, to any of the citizens of the Seminole Nation, whether of Indian blood or not of Indian blood. Plaintiff further alleges that said Robert James, heretofore mentioned, has selected his homestead out of the land allotted to him in the Seminole Nation, and that the land described in defendant's complaint is no part of the homestead of Robert James. Plaintiff further alleged, that said note, evidencing the debt due by said Robert James, is now and was due and payable at the time

this action was instituted, wherefore plaintiff prays that said deed or instrument of writing be declared in fact and in equity a mortgage, and, as such, foreclosed by proper decree divesting the title out of the defendant, and vesting it in the plaintiff, being upon the payment of the amount of indebtedness due the defendant by said Robert James on said note, and if said relief cannot be granted, a commission be appointed to reconvey the title by deed to the plaintiff, and such other and general relief as he may be entitled to.

Thereafter, on the 24th day of April, 1906, the defendant demurred to said amended complaint, for the reason that the facts therein stated were not sufficient to constitute a cause of action; and thereafter, on the 26th day of June, 1906, said demurrer was by the court sustained, to which action at the time the plaintiff then and there excepted; and, defendant failing to plead further, a decree was therein rendered in favor of the defendant, dismissing plaintiff's amended complaint, and taxing all the costs against him, plaintiff at the time duly saving his exception to the action of the court. Thereafter the plaintiff duly prosecuted its appeal to the United States Court of Appeals of the Indian Territory, and the same is now properly before this court, by virtue of the provisions of the enabling act, for determination.

*Gibson & Ramsey,* for plaintiff in error.
*Thomas & De Meules,* for defendant in error.

WILLIAMS, C. J. (after stating the facts as above). The question to be adjudicated in this case is whether or not a citizen of the Seminole Nation, not of Indian blood, after selecting his allotment and receiving his certificate of allotment from the chairman of the Commission to the Five Civilized Tribes, as provided for by the agreement of the 16th day of December, A. D. 1897, on the part of the Seminole Nation of Indians with the United States of America, ratified by an act of Congress, approved on the 1st day of July, 1898 (30 Stat. 567, c. 542; 1 Kappler's Indian Affairs, Laws, and Treaties [2d Ed.] p. 662), can make

a valid sale, deed, or conveyance to that part of his or her allotment not selected as his or her homestead, after the removal of the restrictions on the alienation by the Indian appropriation act, approved April 21, 1904, although no patent had been issued or delivered to such allottee before he undertakes to alienate the same.

That we may properly understand the provisions of the Seminole treaty of 1897, it is important that we examine the treaty made and concluded at Washington, D. C., March 21, 1866, between the United States government and the Seminole Nation, and ratified on the 19th day of July, 1866. It is by virtue of this treaty that the Seminoles acquired the title or right to the property in controversy. Article 3 of said treaty (14 Stat. 72; 2 Kappler's Indian Affairs, Laws and Treaties, p. 911), provides as follows:

"The United States having obtained, by grant of the Creek Nation, the westerly half of their lands, hereby grants to the Seminole Nation the portion thereof hereafter described which shall constitute the national domain of the Seminole Indians. Said lands so granted by the United States to the Seminole Nation are bounded and described as follows, to wit: * * * In consideration of said cession of two hundred thousand acres of land described above, the Seminole Nation agrees to pay therefor the price of fifty cents per acre, amounting to the sum of one hundred thousand dollars, which amount shall be deducted by the sum paid by the United States for Seminole lands under the stipulations above written. * * * *"

Section 15 of an act of Congress, approved March 3, 1893 (27 Stat. 645, c. 209), in part is as follows:

"The consent of the United States is hereby given to the allotment of lands in severalty not exceeding one hundred and sixty acres to any one individual within the limits .of the country occupied by the Cherokee, Creek, Choctaws, Chickasaws and Seminoles; and upon such allotment the individuals to whom the same may be alloted shall be deemed to be in all respects citizens of the United States."

Said act further provides for the appointment of commission-

ers to enter into negotiations with the Five Civilized Tribes for the purpose of extinguishing their national and tribal titles to land. Section 16 of said act is in part as follows:

"The President shall nominate, and by and with the advice and consent of the Senate, shall appoint three commissioners to enter into negotiations with the Cherokee Nation, the Choctaw Nation, the Chickasaw Nation, the Muskogee (or Creek) Nation, the Seminole Nation, for the purpose of extinguishment of the na-. tional or tribal title to any lands within that territory now held by any and all of such nations or tribes either by cession of the same or some part thereof to the United States, or by the allotment and division of the same in severalty among the Indians of such nations or tribes, respectively, as may be entitled to the same, or by such other method as may be agreed upon between the several nations and tribes aforesaid, or each of them, with the United States, with a view to such adjustment, upon the basis of justice and equity, as may, with the consent of such nations or tribes of Indians, so far as may be necessary, be requisite and suitable to enable the ultimate creation of a state or states of the Union which shall embrace the lands within said Indian Territory."

When we consider the foregoing excerpts from the act of March 3, 1893, light is thrown upon the agreement, afterwards entered into on the 16th day of December, 1897, heretofore referred to. The said agreement in part provides as follows:

"All lands belonging to the Seminole Tribe of Indians shall be divided into three grades, designated as the first, second, and third, * * * and the same shall be divided among the members of the. tribe so that each shall have an equal share thereof in value, so far as may be, the location and fertility of the soil considered, giving to each the right to select his allotment so as to include any improvements thereon owned by him at the time, and each allottee shall have the sole right to occupancy of the land so allotted to him during the existence of the present tribal government and until the members of said tribe shall become citizens of the United States. Such allotment shall be made under the direction and supervision of the commission to the Five Civilized Tribes in connection with a representative appointed by the tribal government; and the Chairman of said Commission shall execute

and deliver to each allottee a certificate describing therein the land allotted to him. All contracts for sale, disposition, or encumbrance of any part of any allotment made prior to date of patent shall be void."

It will be observed that said lands "shall be divided among the members of the tribe so that each shall have an equal share thereof in value, so far as may be, the location and fertility of the soil considered; giving to each the right to select his allotment so as to include any improvements thereon owned by him at the time, and each allottee shall have the sole right of occupancy of the land so allotted to him during the existence of the present tribal government and until the members of said tribe shall become citizens of the United States; * * * and the chairman of said Commission shall execute and deliver to each allottee a certificate describing therein the land allotted to him." Obviously, upon the selection of his allotment and the receipt, by the allottee, of a certificate signed by the chairman of the Commission of the Five Civilized Tribes, the land described in said certificate was segregated from the common mass of Seminole land. It could not thereafter be allotted to any other citizen. The allottee could not be deprived of the same, either by the federal government or the Indian tribes.

In the case of *Wirth v. Branson*, 98 U. S. 118, 25 L. Ed. 86, the court stated:

"The rule is well settled by a long course of decisions that, where public lands have been surveyed and placed in the market, or otherwise opened to private acquisition, a person who complies with all the requisites necessary to entitle him to a patent for a particular lot or tract shall be regarded as the equitable owner thereof, and the land is no longer open to selections. The public faith has become pledged to him, and any subsequent grant of the same land to another party is void, unless the first selection or entry be vacated and set aside."

In the case of *Landes v. Brant*, 10 How. (U. S.) 372, 13 L. Ed. 449, the court says:

"Cruise on Real Property (volume 3, pp. 510, 511) lays down the doctrine with great distinctness. He says: 'There is no rule

better founded in law, reason, and conscience than this: That all the several acts and ceremonies necessary to complete a conveyance shall be taken together as one act, and operate from the substantial part by relation.' For the purpose of this case (without proposing to apply the rule to every other) we may assume that the first act of Claymorgan was that of filing his title papers and claim with the recorder of land titles, according to the fourth section of the act of March 3, 1805. This was legally done, and the papers recorded. He claimed under the second section of the act of 1805, which was amended by the act of 1806, and again by the act of 1807. As already stated, by the fourth section of this last act, the decision of the board of commissioners, appointed to investigate such claims, is made final against the United States, and he was entitled to a patent. His claim was fully within the provisions of the acts of 1805 and 1807. Applying the doctrine of relation, and taking all the several parts and ceremonies necessary to complete the title together, 'as one act,' then the confirmation of 1811 and the patent of 1845 must be taken to relate to the first act —that of filing the claim in 1805. On this assumption intermediate conveyances made by the confirmee, or by the sheriff on his behalf, of a date after the first substantial act, are covered by the legal title, and pass that title to alienee. And on this ground the deed made by the sheriff to McNair is valid."

In the case of *Carroll v. Safford,* 3 How. 460, 11 L. Ed. 671, the court says:

"But, independently of the force of usage, we think the construction is sustainable. When the land was purchased and paid for, it was no longer the property of the United States, but of the purchaser. He held it for a final certificate, which could no more be canceled by the United States than a patent. It is true, if the land had been previously sold by the United States, or reserved from sale, the certificate or patent might be recalled by the United States, as having been issued through mistake. In this respect there is no difference between the certificate holder and the patentee. It is said the fee is not in the purchaser, but in the United States, until the patent shall be issued. This is so, technically, at law, but not in equity. The land in the hands of the purchaser is real estate, descends to his heirs, and does not go to his executors or administrators. In every legal and equitable aspect it is considered as belonging to the realty. Now, why cannot such prop-

erty be taxed by its proper denomination as 'real estate'? In the words of the statute, 'as lands owned by nonresidents.' And if the name of the owner could not be ascertained, the tract was required to be described by its boundaries, or in any particular name. We can ascertain, no doubt, that the construction given to this act by the authorities of Michigan, in regard to the taxation of land sold by the United States, whether patented or not, carried out the intention of the law-making power."

In the case of *Witherspoon v. Duncan*, 71 U. S. 210, 18 L. Ed. 342, the court says:

"Arkansas covenanted to abstain from taxation of the public lands within her limits, and to refrain from legislation that should impede the federal government in disposing of them, or interfere with the regulation of Congress for the security of titles. It is clear that the government has not been hindered in selling them, nor Congress obstructed in securing titles; but it is claimed the contract has been violated, because these lands, when taxed, were owned by the United States. In no just sense can lands be said to be public lands after they have been entered at the land office, and a certificate of entry obtained. If public lands before the entry, after it they are private property. If subject to sale, the government has no power to revoke the entry and withhold the patent. A second sale, if the first was authorized by law, confers no right on the buyer and is a void act. Accordingly to the well-known mode of proceeding at the land offices (established for the mutual convenience of buyer and seller), if the party is entitled by law to enter the land, the receiver gives him a certificate of entry reciting the facts, by means of which, in due time, he receives a patent. The contract of purchase is complete when the certificate of entry is executed and delivered, and thereafter the land ceases to be a part of the public domain. The government agrees to make proper conveyance as soon as it can, and in the meantime holds the naked legal fee in trust for the purchaser, who has the equitable title. As the patent emanates directly from the President, it necessarily happens that years elapse, before, in the regular course of business in the General Land Office, it can issue; and if the right to tax was in abeyance during this time, it would work a great hardship to the state, for the purchaser, as soon as he gets his certificate of entry, is protected in his proprietary interest, can take possession, and make lasting and valuable improvements, which

it would be difficult to separate from the freehold for the purpose of taxation. * * * This question was fully considered by this court in *Carroll v. Safford*, 3 How. (U. S.) 450, 11 L. Ed. 671, and the views we have presented only reaffirm the doctrines of that case. But it is insisted that there is a difference between a cash and a donation entry—that the one may be complete when the money is paid, but the other is not perfected until it is confirmed by the General Land Office, and the patent issued. That Congress has the entire control of the public lands, can dispose of them for money, or donate them to individuals or classes of persons, cannot be questioned. If the law on the subject is complied with, and the entry conforms to it, it is difficult to see why the right to tax does not attach as well to the donation as to the cash entry. In either case, when the entry is made and certificate given, the particular land is segregated from the mass of public lands, and becomes private property. In the one case, the entry is complete when the money is paid; in the other, when the required proofs are furnished. In neither case can the patent be withheld if the original entry was lawful. In the case of *Lessee of French et ux. v. Spencer*, 21 How. (U. S.) 239, 16 L. Ed. 97, Mr. Justice Catron, speaking for the court, said: 'Whether the patent related back in support of Spencer's deed is not a new question in this court.' It arose in the case of *Landes v. Brant,* 10 How. (U. S.) 372, 13 L. Ed. 449, where it was held that a patent, issued in 1845 'to Claymorgan and his heirs,' by which the heirs took the legal title, related back and inured to the protection of a title, founded on a sheriff's sale of Claymorgan's equitable interest, made in 1808. There, as here, the contest was between the grantee's heirs and the purchaser of the incipient title; the court holding that when the patent issued, it related to the inception of title, and must be taken, as between the parties to the suit, to bear date with the commencement of title."

In the case of *Doe ex dem. Mann et al. v. Wilson*, 23 How. (U. S.) 461, 16 L. Ed. 584, Mr. Justice Catron, speaking for the court, said:

"By the treaty of October 27, 1832, made by the United States, through commissioners, with the Pottawatomie Tribe of Indians and the state of Indiana and Michigan Territory, said nation ceded to the United States their title and interest in and to their lands in the state of Indiana and Illinois, and the Michigan

Territory south of Grand river. Many reservations were made in favor of Indian villagers, jointly and to individual Pottawatomies. The reservations are by sections, amounting probably to 100, lying in various parts of the ceded country. As to these, the Indian title remained as it stood before the treaty was made; and to complete the title as to the reserved lands the United States agreed that they would issue patents to the respective owners. One of these reservees was the chief Pet-chi-co, to whom was reserved two sections. The treaty also provides 'that the foregoing reservations shall be selected under the direction of the President of the United States, after the land shall have been surveyed, and the boundaries shall correspond with the public surveys.' In February, 1833, by a deed in fee simple, Pet-chi-co conveyed to Alexis Coquillard and David H. Colerick, of the state of Indiana, 'all those sections of land lying in the state aforesaid, in the region of country or territory ceded by the treaty of 27th October, 1832.' The grantor covenants lawful authority to sell and convey the same and he furthermore warrants the title against himself and his heirs. Under this deed the defendant holds possession. The lessors of the plaintiff took a deed from Pet-chi-co's heirs, dated, 1855, on the same assumption that their ancestors' deed was void; having died in 1833, before the lands were surveyed, or the reserved sections selected. And on the trial below the court was asked to instruct the jury that Pet-chi-co held no interest, under the treaty in the lands in question, up to the time of his death, that was assignable; he having died before the location of the land, and before the patents issued.' This instruction the court refused to give; but, on the contrary, charged the jury that 'the description of the land in the deed from Pet-chi-co to Coquillard and Colerick, from Colerick to Coquillard, and from Coquillard to Wilson, are sufficient to identify the land, thereby intended to be conveyed, as the same two sections of land which are in controversy in this suit, and which are described in the patents which have been read in the evidence.' * * * The only question presented by the record that we feel ourselves called on to decide is whether Pet-chi-co's deed of February, 1833, vested his title in Coquillard and Colerick. The Pottawatomie Nation was the owner of the possessory right of the country ceded, and all the subjects of the nation were joint owners of it. The reservees took by the treaty, directly from the nation, the Indian title; and this was the right to *occupy, use, and enjoy* the lands, in common with the

United States, until partition was made, in the manner prescribed. The treaty itself converted the reserved sections *into individual property*. The Indians as a nation reserved no interest in the territory ceded; but, as a part of the consideration for the cession, certain individuals of the nation had conferred on them portions of the land, to which the United States title was either added, or promised to be added, and it matters not which, for the purpose of this controversy for possession. The United States held the ultimate title, charged with the right of undisturbed occupancy and perpetual possession, in the Indian nation with the exclusive power in the government of acquiring the right. *Johnson v. McIntosh*, 8 Wheat. (U. S.) 603, 5 L. Ed. 681; *Cornet v. Winton's Lessee*, 2 Yerg. (Tenn.) 147. Although the government alone can purchase lands from an Indian nation, it does not follow that, when the rights of the nation are extinguished, an individual of the nation, who takes as a private owner, cannot sell his *interest*. The Indian title is property and alienable, unless the treaty had prohibited its sale. *Cornet v. Winton's Lessee*, 2 Yerg. (Tenn.) 148; *Blair and Johnson v. Pathkiller's Lessee*, 2 Yerg. (Tenn.) 414. So far from this being the case in the instance before us, it is manifest that sales of the reserved sections were contemplated, as the lands ceded were forthwith to be surveyed, sold, and inhabited by white population, among whom the Indians could not remain. We hold that Pet-chi-co was a tenant in common with the United States, and could sell his reserved interest; and that when the United States selected the lands reserved to him and made partition (of which the patent is conclusive evidence), his grantees took the interest he would have taken if living. In the case of *Crews et al. v. Burcham et al.*, 1 Black (U. S.) 357, 17 L. Ed. 91, the court said: 'Some expressions in the opinion delivered in the case of *Doe v. Wilson*, the first case that came before us arising out of this treaty, were the subject of observation by the learned counsel for the appellant in the argument, but which were founded on a misapprehension of their scope and purport.' It was supposed that the court had held that the reservee was a tenant in common with the United States after the treaty of cession, and until the surveys and patent. It will be seen, however, that the tenancy in common there mentioned referred to the right to *occupy, use, and enjoy* the lands in common with the government, and had no relation to the legal title."

In the case of *Crews v. Burcham,* 1 Black (U. S.) 352-358, 17 L. Ed. 91, the treaty under consideration by the court being that with the Pottawatomie tribe of October 27, 1832, by which the nation ceded all its lands in Illinois and other states, subject to certain regulations, the court said:

"It is true that no title to the particular lands in question could rest in the reservee, or in his grantee, until the location by the President, and, perhaps the issuing of the patent; but the obligation to make the selection as soon as the lands were surveyed, and to issue the patent, is absolute and imperative, and founded on a valuable and meritorious consideration. The lands reserved constituted part of the compensation received by the Pottawatomies for the relinquishment of their right of occupancy to the government. The agreement was one which, if entered into by an individual, a court of chancery would have inforced by compelling the selection of the lands and the conveyance in favor of the reservee, or, in case he had parted with his interest, in favor of his grantees. And the obligation is not the less imperative and binding because entered into by the government. The equitable right, therefore, to the lands in the grantee of Beison, when selected, was perfect; and the only objection of any plausibility is the technical one as to vesting of the legal title."

Mr. Justice Field, in *Stark v. Starr,* 6 Wall. (U. S.) 418, 18 L. Ed. 925, says:

"The right to patent once vested is treated by the government, when dealing with the public lands, as equivalent to a patent issued. When, in fact, the patent does issue, it relates back to the inception of the right of the patentees, so far as it may be necessary to cut off intervening claimants. If the patent relates back to the inception of the right to it to cut off intervening claimants, with equal reason and justice it must relate back to estop the patentee from asserting title against his grantee under warranty deed made before the patent actually issued, and after his right to it had become absolute."

In the case of *Francis v. Francis,* 203 U. S. 238, 27 Sup. Ct. 129, 51 L. Ed. 167, Mr. Justice Harlan, speaking for the court, said:

"The third article is in the following words: 'There shall be
Vol. 21—20

reserved for the use of each of the persons hereinafter mentioned, and their heirs, which persons are all Indians by descent, the following tracts of land, to be located at and near the Grand Traverse of the Flint river, in such manner as the President of the United States may direct.' It is very clear that, if a fee-simple estate was intended to be granted, the parties to the treaties were unfortunate in the choice of terms by which to give effect to that intention; and yet it is difficult to conceive that any other estate was in the contemplation of the parties at the time of its existence. Will, then, the third article warrant such a construction? It will be observed that the reservation is to the use of Mokitchenoqua and 'her heirs.' No limitation as to the time of holding, or restriction upon the right of alienation, is contained in the grant. The use of the word 'heirs' clearly implies that such an estate was granted as would, upon her death, descend to her legal representatives. Here, then, are all the essential elements of a fee-simple estate. This construction, we think, is justified by the words of the third article, and is strengthened by the fact that it corresponds, not only with the opinion given by the Attorney General of the United States to the Secretary of War (Land Laws, pt. 2, pp. 96, 97), but with the opinion of the Senate—a branch of the treaty-making power—which is certainly entitled to great consideration (3 Senate Doc. 1836, No. 197). Again, in the same case, the court said: 'The location of the lands became a duty, devolving on the President, of the treaty. This duty he could execute with an act of Congress, the treaty, when ratified, being the supreme law of the land, which the President was bound to see executed. It was impossible to describe the tract granted to any of the reservees in the treaty, as it is matter of history that none of the lands ceded had ever been surveyed. But locality is given to the grant by the terms of the treaty, with authority to locate afterwards by a survey making it definite. *Smith v. United States,* 10 Pet. (U. S.) 326, 9 L. Ed. 444. This authority being executed, the grant then became as valid to the particular section designated by the President as though the description had been incorporated in the treaty itself. We are therefore of opinion that a fee-simple passed to the reservee, Mokitchenoqua, by force of the treaty itself, and that the rights of the parties could in no wise be affected by the subsequent act of the President directing a patent to be issued."

The court further says:

"In *Dewey v. Campau,* 4 Mich. 565, 566, the court, inter-

preting the same treaty, said: 'A title in fee under this clause of the treaty passed, by this language, to the reservee.' The term 'reservation' was equivalent to an absolute grant. The title passed as effectually as if the grant had been executed. The title was conferred by the treaty. It was not, however, perfect until the location was made. The location was necessary to give it identity. The location was duly made, and thus the title to the land in controversy was consummated by giving identity to that which was before located."

In the case of *Jones v. Meehan*, 175 U. S. 4, 20 Sup. Ct. 2, 44 L. Ed. 51, the court said:

"By article 9 of the treaty: 'Upon the urgent request of the Indians, parties to this treaty, there shall be set apart from the tract hereby ceded a reservation of six hundred and forty acres near the mouth of Thief river for the chief Moose Dung, and a like reservation of six hundred and forty acres for the chief Red Bear on the north side of Pembina river.' * * Moose Dung selected as his reservation under the ninth article of this treaty, 640 acres, a part of which was lot 1 in section 34, including the strip now in controversy; and he. lived on that land at the mouth of Thief river, and made it his home, and had a log house, a garden, and a fish trap there. He died in 1872, before the lands were surveyed, and was succeeded, as chief, by his eldest son, who had been born at Red Lake in 1828, and who was known to the whites by the same name of Moose Dung or Monsimoh, and to the Indians as Mayskokonoyay, meaning 'The one that wears the red robes'; and, ever since the making of the treaty, his father and himself, in succession, sustained tribal relations with the Red Lake band of Chippewa Indians, and that band continued to be recognized as an Indian tribe by the government of the United States. * * * The clear result of this series of decisions is that when the United States, in a treaty with an Indian tribe, and as part of the consideration for the cession by the tribe of a tract of country to the United States, make a reservation to a chief of another member of the tribe of a specified number of sections of land, whether already identified, or to be surveyed and located in the future, the treaty itself converts the reserved sections into individual property, the reservation, unless accompanied by words limiting its effect, is equivalent to a present grant of a complete title in fee simple; and that title is alienable by the grantee at his

pleasure, unless the United States, by a provision of the treaty or an act of Congress, have expressly or impliedly prohibited or restricted its alienation. * * * The title to the strip of land in controversy, having been granted by the United States to the elder chief Moose Dung by the treaty itself, and having descended, upon his death, by the laws, customs, and usages of the tribe, to his eldest son and successor, as chief, Moose Dung the younger, passed by the lease, executed by the latter in 1891, to the plaintiffs for the term of that lease; and their rights under that lease could not be divested by any subsequent action of the lessor, or of Congress, or of the executive departments. The construction of treaties is the peculiar province of the judiciary; and, except in cases purely political, Congress has no constitutional power to settle the rights under a treaty, or to affect titles already granted by the treaty itself. * * * "

In the case of *Wallace v. Adams,* 143 Fed. 720, 74 C. C. A. 540, the United States Circuit Court of Appeals for the Eighth Circuit, in construing the Choctaw-Chickasaw agreements, containing provisions for the allotment of land in said nations therein, said:

"The Commission, under the direction of the Secretary, is a special tribunal, vested with the power to hear and determine the claims of all parties to allotment in these lands and to execute its judgment by the issuance of the allotment certificates, which constitute conveyance of the right of the lands to the parties whom they decide are entitled to the property. * * * The allotment certificate, when issued, like a patent to land, is dual in its effect. It is an adjudication of the special tribunal, empowered to decide the question that a party to whom it issues is entitled to the land, and it is a conveyance of the right to this title to the allottee."

This case was affirmed by the Supreme Court of the United States. See *Wallace v. Adams,* 204 U. S. 419, 27 Sup. Ct. 363, 51 L. Ed. 547.

The case of *Quinney v. Denney,* 18 Wis. 485, was a case involving the right of the allottee to sell his allotment before patent was issued. That was an action in ejectment, and it appears that the land was filed on or taken in 1845, 15 years before the date of the patent. The court held that the law or treaty gave the allotteen an equitable title. It is said:

"Now we are of the opinion that this act created or gave to the allottee an equitable estate or title in the land allotted to him, which could be sold and transferred by deed, and that when the patent subsequently issued to him it inured to the benefit of his grantee. We think that this position is abundantly sustained by the following authorities cited on the brief of the counsel for the appellant: *Strother v. Lucas,* 12 Pet. (U. S.) 410, 9 L. Ed. 1137; *Stoddard v. Chambers,* 2 How. (U. S.) 284, 11 L. Ed. 269; *Grignon v. Astor,* 2 How. (U. S.) 319, 11 L. Ed. 283; *Les Bois v. Bramell,* 4 How. (U. S.) 449; 11 L. Ed. 1051; *Marsh v. Brooks,* 8 How. (U. S.) 223, 12 L. Ed. 1056; *Landes v. Brant,* 10 How. (U. S.) 348, 13 L. Ed. 449; *United States v. Brooks,* 10 How. (U. S.) 442, 13 L. Ed. 489; *French v. Spencer,* 21 How. (U. S.) 228, 16 L. Ed. 97; *Berthold v. McDonald,* 22 How. (U. S.) 334, 16 L. Ed. 318; *Doe v. Wilson,* 23 How. (U. S.) 458, 16 L Ed. 584; *Crews v. Burcham,* 1 Black (U. S.) 352, 17 L. Ed. 91; *Challefoux v. Ducharme,* 4 Wis. 554."

The Supreme Court of the United States and other courts have uniformly held that the patent, issued to the purchaser by the government, is not a new acquisition of title. It is only a confirmation of the right which the patentee had before the patent was issued. *Cornelius v. Kessel,* 128 U. S. 456-463, 9 Sup. Ct. 122, 32 L. Ed. 482; *Stoddard v. Chambers,* 2 How. (U. S.) 284, 11 L. Ed. 269; *Bissel v. Penrose,* 8 How. (U. S.) 317, 12 L. Ed. 1095; *Shepley v. Cowan,* 91 U. S. 330-340, 23 L. Ed. 424; *Dibble v. Bellingham Bay Land Co.,* 163 U. S. 65-68, 16 Sup. Ct. 939, 41 L. Ed. 72; *Defenback v. Hawke,* 115 U. S. 392, 6 Sup. Ct. 95, 29 L. Ed. 423; *Spiess v. Neuberg,* 71 Wis. 279, 37 N. W. 417, 5 Am. St. Rep. 211; *Faull v Cook,* 19 Or. 455, 26 Pac. 662, 20 Am. St. Rep. 836; *Morrison v. Faulkner,* (Tex. Civ. App.) 21 S. W. 984; *Rozell v. C., M. & L. Co.* (Ark.) 89 S. W. 469; *Frost v. Missionary Society,* 56 Mich. 62, 22 N. W. 203; *Jackson v. Ramsay,* 3 Cow. (N. Y.) 76, 15 Am. Dec. 242; 3 Washburn, Real Property (6th Ed.) § 2034.

In May, 1863, Congress passed an act, providing that in all cases where patents for public lands have been or may be hereafter issued in pursuance to any law of the United States, if a person

had died, or shall hereafter die, before the date of such patent, the title to the land designated therein shall inure to and become vested in the heirs of the devisees or assigns of such deceased as if the patent had been issued to the deceased patentee during life. Act May 20, 1836, c. 76, 5 Stat. 31.

In the case of *Oliver v. Forbes,* 17 Kan. 127, it was held that this act applied to the case of an Indian who had received his land under a treaty with the United States. After citing a number of cases referring to patent issued after the death of the patentee, the Kansas Supreme Court said:

"If the patent is valid, it is so merely because it is in confirmation of other existing rights, and not because it created any new rights."

In the case of *Briggs v. Wash-puk-qua* (C. C.) 37 Fed. 135, the validity of a conveyance executed before patent was issued was involved, and Judge Foster said:

"The right to the patent was absolute and complete, and the duty of the Secretary of the Interior to issue the patent was imperative."

In the case of *Porter v. Parker,* 68 Neb. 338, 94 N. W. 123, the court said (referring to Act Cong. Aug. 7, 1882, c. 434, 22 Stat. 342, which is as follows):

" 'That upon the approval of the allotments provided for in the preceding sections by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect and declare that the United States does and will hold the land thus allotted for a period of twenty-five years in trust for the sole use and benefit of the Indian to whom the allotment shall have been made, or in case of his decease, of his heirs according to the laws of the state of Nebraska, and at the expiration of said period, the United States will convey the same by patent to said Indian or his heir as aforesaid, in fee discharged of said trust and free of all incumbrance and charge whatever, and if any conveyance shall be made of the land set apart and allotted as herein provided, or any contract made touching the same before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void:   Provided

that the law of descent and partition in force in the said state shall apply thereto after patents have been executed and delivered.' On the 29th day of December, 1884, a patent for 160 acres, or a quarter section, of such lands, reciting, in substance, the terms of the foregoing section of the statute, was issued to one Phillip Porter, a member of the tribe, in satisfaction of his right to participate in such allotment. At that time Porter was the head of a family, consisting, besides himself, of his wife, the defendant, Ne-da-wa Parker, and of a daughter. After the delivery of the patent Porter died intestate, leaving his wife and daughter surviving. Some time afterwards the daughter died, also intestate, and without issue. The allottee was the son of Daniel Porter, the plaintiff in this action. Since the death of her husband and daughter the defendant has remained in the exclusive possession of the land, claiming to be lawfully entitled thereto. The foregoing matters were submitted to the district court of Thurston county upon an agreed statement of facts, praying the judgment of the court whether the plaintiff or defendant has the better right in the premises. To review a judgment in favor of defendant the plaintiff prosecutes a petition in error in this court."

The court further states:

"In our opinion an allottee and patentee of lands in severalty, pursuant to the above-mentioned act of Congress, is seised of an equitable interest and estate in fee, which, upon his death, before the issuance of a final patent therefor by the United States, descends to his or her heirs at law, according to the laws of inheritance of this state."

The syllabus in the case of *McCauley v. Tyndall*, 68 Neb. 685, 94 N. W. 813, is as follows:

"Under Act Cong. Aug. 8, 1882, c. 434, 22 Stat. 341, entitled 'An act to provide for the sale of a part of the reservation of the Omaha Tribe of Indians in Nebraska,' etc., the widow of an allottee, dying before the issuance of the final patent, and without issue, takes a life estate in the allotment to her husband, remainder to his father."

The right of a person who has located a valid land certificate upon vacant public land, and has caused such land to be surveyed, and the survey and certificate to be returned to the General Land Office within the time prescribed by law, is a vested legal right, and

is entitled to the protection of all the constitutional guaranties with which such rights are hedged. *Howard v. Perry,* 7 Tex. 259; *Hamilton v. Avery,* 20 Tex. 612; *Milam County v. Bateman,* 54 Tex. 153; *Gullett v. O'Connor,* 54 Tex. 408; *Snyder v. Methvin,* 60 Tex. 487; *Jones v. Lee,* 86 Tex. 25, 22 S. W. 386, 1092; *Thread-gill v. Bickerstaff,* 87 Tex. 520, 29 S. W. 757; *Olcott v. Ferris,* (Tex. Civ. App.) 24 S. W. 848; *Sherwood v. Fleming,* 25 Tex. Sup. 408; *Thompson v. Dumas,* 85 Fed. 517; 29 C. C. A. 312.

The lands of the Seminole Nation belong to the nation in its sovereign capacity, and not to its citizens as tenants in common. The lands and money of the Seminole Nation are public property and public moneys, and are not held in an individual ownership. *Stephens v. Cherokee Nation,* 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041.

In the Cherokee Nation the land is held by virtue of a patent, issued by the federal government on the 1st day of December, 1838, pursuant to treaty stipulation, which provides as follows:

"Therefore in the execution of the agreements and stipulations contained in the said several treaties, the United States have governed and granted unto the said Cherokee Nation the two tracts of land so surveyed and hereinbefore described, containing in the whole 14,374,135.14 acres, to have and to hold the same, together with all the rights, privileges and appurtenances thereunto belonging, to the said Cherokee Nation forever; subject, however, to the rights of the United States to permit other tribes of red men to get salt on the salt plains of the Western Prairie, referred to in the second article of the treaty of December, 1835," etc.

As to the Creek Nation, article 3 of treaty of February 14, 1833 (7 Stat. 417), provides: "The United States will grant a patent in fee simple, to the Creek Nation of Indians for the land assigned said nation by this treaty or convention, whenever the same shall have been ratified by the President and Senate of the United States, and the right thus guaranteed by the United States shall be continued to said tribe of Indians, so long as they shall exist as a nation and continue to occupy the country hereby assigned

them;" and afterwards the patent was issued in accordance with this treaty stipulation.

As to the Choctaw Nation, article 2 of treaty of September 27, 1830 (7 Stat. 333), provides:

"The United States under a grant specially to be made by the President of the United States shall cause to be conveyed to the Choctaw Nation a tract of country west of the Mississippi river, in fee simple to them and their descendents, to inure to them while they shall exist as a nation and live on it."

President Tyler in 1842 executed the patent pursuant to the provisions of said treaty. The *habendum* clause of the same is as follows:

"To have and to hold the same with all the rights, privileges, immunities and appurtenances of whatsoever nature thereunto belonging as intended to be conveyed by the aforesaid article in fee simple to them and their descendents, to inure to them while they shall exist as a nation and live on it, liable to no transfer or alienation except to the United States or with their consent."

By virtue of the treaty of.1837 (11 Stat. 573) the Chickasaws and Choctaws jointly held the Choctaw grant on the same terms that the Choctaws previously held it. By virtue of treaty of June 22, 1855, it was provided that a certain district in the Choctaw Nation should be occupied by the Chickasaws, and that the land included in both the Choctaw and Chickasaw district was to be held in common, so that each and every member of said tribes shall have an equal and undivided interest in the whole. Article 1 of said treaty is as follows:

"And pursuant to an act of Congress approved May 28, 1830, the United States do hereby forever secure and guarantee the lands embraced within the said limits, to the members of the Choctaw and Chickasaw Tribes, their heirs and successors, to be held in common; so that each and every member of either tribe shall have an equal, undivided interest in the whole: Provided, however, no part thereof shall ever be sold without the consent of both tribes, and that said land shall revert to the United States if said Indians and their heirs become extinct or abandon the same."

Whilst we hold that, in the case of the Seminole Nation, the land and moneys of that tribe are public property, and are not held in an individual ownership, it is not to be inferred that the same rule applies to all the other nations of the Five Civilized Tribes. Such question not being before us, the same is specifically reserved.

There can be no serious question of the authority of Congress to remove the restrictions upon the alienation of land of the allottees without the consent of the tribe. *Thomas v. Gay*, 169 U. S. 264-266, 18 Sup. Ct. 340, 42 L. Ed. 740; *Ward v. Race Horse*, 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244; *Cherokee Tobacco Co.*, 11 Wall. (U. S.) 616, 20 L. Ed. 227. In section 15, *supra,* of the act of Congress of March 3, 1893, wherein the Congress consents to the allotment of the lands in severalty not exceeding 160 acres of land to any one individual within the limits of the country occupied by the Cherokee, Creek, Choctaw, Chickasaw, and Seminole Nations, it was carrying out the settled policy theretofore existing on the part of the general government toward the Indian tribes. In the various treaties made in 1866 between the United States government and the Five Civilized Tribes it is apparent that it was contemplated that these lands should be ultimately allotted in severalty. And said section 15 was evidently inserted with the view that the Indian tribes, upon their own initiative, if they so elected, might proceed with such allotment, and that such allottees would, by virtue of section 6, c. 119, 24 Stat. at Large, 390, *supra,* by the completion thereof, and the issuing and delivering of patents, become citizens of the United States.

In the succeeding section, which is section 16 of said act, Congress also contemplated the initiation of such movement on the part of the federal government. In other words, the United States government, by an act of Congress of March 3, 1893, said to the members of the Five Civilized Tribes:

"It is our policy to extinguish the Indian title in your country, and, allotment in severalty being necessary to accomplish this, we consent that you may proceed with the allotment, but, at the

same time recognizing the fact that there are grave doubts of your acting upon such suggestions, commissioners on the part of the general government shall be appointed to negotiate with you looking to that end, in order to bring about the ultimate creation of a state or states of the Union, which shall embrace the lands comprising your territory."

And as a result of that negotiation, the treaty of the 16th day of December, 1897, was consummated, providing for the classification of the lands and the division of the same. As was said by the court in the case of *Witherspoon v. Duncan, supra,* it necessarily happens, in consummating the machinery of allotment, and the issuance of patents for the same in the reasonable expedition of such business, that years may elapse before the same finally issues.

Further, it must have been intended by the words "that each allottee shall have the sole right of occupancy of the land so allotted to him during the existence of the present tribal government" to exclude the tribal authorities, under their tribal authority, from attempting to deprive such allottee of the individual use thereof. In other words, it was the purpose of Congress to bring to an end public ownership, and it was perfectly natural to insert a provision that would exclude, during the continuance of the tribal government, the tribal authorities from doing anything that would continue such possession and use of such allotment. It is further provided that each allottee shall have the sole right of occupancy of the land so allotted to him until the members of said tribe shall become citizens of the United States. Under section 6, c. 119 (24 Stat. 390), *supra,* the allottee would not become a citizen of the United States until the patent was issued to him. Said section is as follows:

"That upon the completion of said allotments and the patenting of said lands to said allottee, each and every member of the respective bands or tribes of Indians to whom the allotment shall be made, shall have the benefit of and be subject to the laws, both civil and criminal, in the state or territory in which they reside; and no state or territory shall pass a law denying any such Indian within its jurisdiction the equal protection of the law, and

every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act or under any law of the territory, and every Indian born within the United States who has voluntarily taken up within said limits his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared a citizen of the United States and entitled to all the rights privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the United States, without in any manner affecting the right of such Indian or tribe to other property."

Afterwards Congress, by Act March 3, 1901, c. 868, 31 Stat. 1447, provided:

"That section 6 of chapter 119, of the U. S. Statutes at Large, No. 24, page 390, is hereby amended as follows, to wit: After the words 'civilized life' in line 13 of said section 6, insert the words 'and every Indian in the Indian Territory.' "

And, later, Congress provided by Act April 21, 1904, c. 1402, 33 Stat. 204, as follows:

"And all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who were not of Indian blood, except minors, and, except as to homesteads, are hereby removed, and all the restrictions upon the alienation of all other allottees of said tribes, except minors, and except as to homesteads may, with the approval of the Secretary of the Interior, be removed under such rules and regulations as the Secretary of the Interior may prescribe upon application of the United States Indian agent at the Union agency in charge of the Five Civilized Tribes, if said agent is satisfied, upon full investigation of each individual case, that the removal of said re-restrictions is for the best interest of said allottee,"

Why did Congress include the Seminole Nation within the provisions of this act, unless it would have had the effect to render lands alienable in said nation?

With the act of March 3, 1893, for the allotment and division of the lands in severalty among the Indians with the view of the ultimate creation of a state, this act, removing restrictions as to alienation, accords. Just as the general government, by donation

and homestead acts, has laid the predicate for the establishment
and building of homes within other states erected out of the ter-
ritories, in the country of the Five Civilized Tribes, where no
public domain existed for settlement by the noncitizens therein,
the necessity arose for the removal of restrictions on alienation that
the Indian might have opportunity to sell and convey to his non-
citizen neighbor and home builder, such a course being to the
mutual advantage of both races, to bring about individual owner-
ship, erect a state and industrially and commercially develop the
same.  And with like purpose it is provided in the treaty of De-
cember 16, 1897, as follows:

"The town site of Wewoka shall be controlled and disposed
of according to the provisions of an act of the General Council of
the Seminole Nation, approved April 23, 1897, relative thereto;
and upon the extinguishment of the tribal government deeds of
conveyance shall issue to owners of lots as herein provided for al-
lottees; and all lots remaining unsold at that time may be sold
in such manner as may be prescribed by the Secretary of the
Interior."

It certainly would not be contended that when a lot of the
Wewoka town site was sold to the purchaser, and the consideration
therefor had been paid, and the purchaser had gone into posses-
sion, and a certificate for the purchase price had been issued by
the proper officer of the Seminole Nation, such purchaser would
not have had an equitable estate in fee in said lot.  This con-
struction is in accord with a uniform rule laid down by the Su-
preme Court of the United States.  But if it were a question of
first impression, to make any other ruling would be contrary to
sound reason.  For it states that upon the extinguishment of the
tribal government these "conveyances shall issue to owners of lots
as herein provided for allottees and all lots remaining at that
time may be sold in such manner as may be prescribed by the Sec-
retary of the Interior."

An admission is therein contained that the purchaser of said
lot was the owner thereof.  How did he get to be the owner?  By

purchasing and paying for the same? Suppose that said treaty had also contained a provision that such purchaser of lot should not alienate or incumber the same in any way until conveyance or patent had been executed by the proper tribal authorities, and afterwards that prohibition as to alienation or incumbrance had been repealed, would any one have the hardihood to contend that such lot would not then and there become alienable?

A similar question was passed on by the Supreme Court of the United States in the case of *Barney v. Dolph,* 97 U. S. 656, 24 L. Ed. 1063. Chief Justice Waite, delivering the opinion for the court, said:

"The only question within our jurisdiction presented by this record is whether, after a husband and wife had perfected their right to a patent for lands in Oregon, under Donation Act Sept. 27, 1850, c. 76, 9 Stat. 496, and after the amendment of July 17, 1854 (10 Stat. 306, c. 85), they could, before receiving the patent, sell and convey the lands so as to cut off the rights of the children or heirs of the husband or wife, in case of his or her death before the patent was actually issued. This depends upon the effect to be given the original act, when construed in connection with the amendment. The original act, after providing for a grant to the husband and wife of 640 acres of land, one-half to the husband and one-half to the wife in her own right, declared that: 'In all cases where such married persons have complied with the provisions of this [the] act, so as to entitle them to the grant as above provided, whether under the late provisional government of Oregon, or since, and either shall have died before patent issued, the survivor and children or heirs of the deceased shall be entitled to the share or interest of the deceased in equal proportions, except where the deceased shall otherwise dispose of it by testament, duly and properly executed according to the laws of Oregon'; and then, 'that all future contracts by any person or persons entitled to the benefits of this act, for the sale of the land to which he or they may be entitled under this act before he or they shall have received their patent therefor, shall be void.' The amendment of 1854 repealed this prohibition of sales.

"The point to be decided is not whether, before the amendment, such a conveyance could have been made, or whether, if the conveyance had not been made, the children or heirs of a

deceased husband or wife would take by descent or purchase, or whether the grant from the United States was one which took effect from the time of the passage of the act, or a subsequent entry and settlement; but whether after the amendment the husband and wife held by such a title that, before patent, but after their right to one had become absolute, they could sell and convey, so as to vest in the purchaser either a legal or equitable estate in fee simple—legal, if the title had already passed out of the United States by virtue of the act of Congress and a full compliance with its provisions; equitable, if the patent was needed to perfect the grant. The question is one of legislative intent, to be ascertained by examining the language which Congress has used, and applying it to the subject-matter of the legislation. The prohibition of sales, although contained in section 4, applied to all persons entitled to the benefit of the act, and its repeal was, under the circumstances, equivalent to an express grant of power to sell. The prohibitions were of the sale, before patent, of the land to which the settler was entitled under the act. The repeal, therefore, operated, under the circumstances, the same as a grant of power to sell the land, even though a patent had not issued. This, in the absence of anything to the contrary, implied the power to convey all the government had parted with. When the right to a patent once became vested in a settler under the law, it was equivalent, so far as the government was concerned, to a patent actually issued. We so decided in *Stark v. Starr, supra.* The execution and delivery of the patent after the right to it is complete are the mere ministerial acts of the officer charged with the duty. An authorized sale of a settler, therefore, after his right to a patent had been fully secured, was, as to the government, a transfer of the ownership of the land."

It is clear that under the provisions of the treaty of the 16th day of December, 1897, when a member of the Seminole Tribe selected his allotment, the same being segregated, and the selection and designation of his homestead from the common mass of the Seminole land, after the issuance of the certificate to him therefor, his right thereto became absolute and indefeasible; that by the terms of the treaty he was to have the sole right of occupancy during the existence of the tribal government, the tribal authorities thereby being excluded from continuing any further public occupancy so far as said allotment was concerned, and it

being contemplated by said treaty that a patent should be issued
to the allottee immediately on the expiration of the tribal govern-
ment, it naturally followed that such member of the Seminole
Tribe would then and there become a citizen of the United States.
It was further, then, the intention of Congress to restrict the
alienation of all of said allotment until the expiration of the tribal
government, by the insertion of the following clause in said treaty
agreement, to wit: "All contracts for sale, disposition or incum-
brance of any part of any allotment made prior to the date of
patent shall be void." In fine, it was provided that, during the
existence of the tribal government, each allottee shall have the
sole right of occupancy of his allotment, and until the members
of the tribe shall become citizens of the United States. Then
follow the restrictions of the alienation until the patent shall
be issued. When all such restrictions on alienation were removed,
what prevented the allottee herein from executing a valid con-
veyance?

Further, Congress, in section 16, c. 1876, entitled "An act to
provide for the final disposition of the Five Civilized Tribes in
Indian Territory, and for other purposes," approved April 26,
1906, provides that:

"Conveyances heretofore made by members of any of the
Five Civilized Tribes subsequent to the selection of allotment and
subsequent to the removal of restrictions, where patents there-
after issue, shall not be deemed or held invalid solely because
said conveyances were made prior to the issuance and recording
and delivery of patent deed; but this shall not be held construed
to affect the validity or invalidty of such conveyance except as
hereinbefore provided."

When we consider this provision, in connection with the act
of April 21, 1904, removing all restrictions upon the alienation
of lands of all allottees of either of the Five Civilized Tribes of
Indians who are not of Indian blood, except minors, and except
as to homesteads, in the light of *Barney v. Dolph, supra,* and the
other authorities heretofore cited, unquestionably the allottee

herein could convey all of his allotment except that portion designated by him as his homestead.

In the case of *Pickering v. Lomax*, 145 U. S. 310, 12 Sup. Ct. 860, 36 L. Ed. 716, it was held that the consent of the Secretary of the Interior was effective, though given after the execution of the deed. In that case the patent of the Indian contained a stipulation, authorized by treaty, that the land should not be conveyed to any person whatever without permission of the President of the United States. A deed was made to the Indian, however, August 2, 1858, which was approved by the President January 21, 1871, nearly 13 years thereafter; and it was held that the approval related back of the time of the execution of the deed, and made it valid as to that deed, regardless of the claim of any intervening parties.

In the case of *Lykins v. McGrath*, 184 U. S. 169, 22 Sup Ct. 450, 46 L. Ed. 485, it is held that the consent of the Secretary of the Interior to a conveyance by one holding under a patent, containing a restriction stipulation, may be given after the execution of the deed, and, when given, is retroactive in its effect, and relates back to the date of the conveyance, regardless of the claim of intervening parties, whose alleged rights accrued subsequent to the date of the conveyance. What was the intention of Congress, when it removed restrictions from alienation of allottees not of Indian blood, as to their surplus allotment in the Seminole country? If the construction contended for by the defendant in error is correct, that act of Congress, removing restrictions as to allottees in the Seminole Nation, was without effect whatever, because at the time the tribal government had not terminated, nor has it yet in all respects.

We accordingly conclude that the herein allottee, Robert James, a member of the Seminole Tribe, but not of Indian blood, after selecting his allotment, and designating his homestead, and receiving his certificate of such allotment from the chairman of the Commission of the Five Civilized Tribes, as provided for in

the agreement of December 16, 1897, became the equitable owner of the same, vested with an indefeasible title therein, and that the duty or obligation to issue a patent therefor was imperative, and not discretionary, with the tribe or government, and could make a binding sale, deed, or conveyance on that part of his allotment not selected as a homestead, after the removal of the restrictions on alienation by the Indian appropriation act, approved April 21, 1904, although no patent had been issued or delivered to said allottee before he undertook to alienate the same.

The other question raised in this record is whether or not, where an instrument, appearing on its face as a deed in the form of a warranty, is confessed by the demurrer to have been intended as a mortgage, the owner of the land subject to the mortgage may in equity have said instrument declared to be a mortgage, and under such have the right to redeem the property. This is well settled under the authorities. See Pomeroy's Eq. Juris. §§ 1192-1196; *White v. Henry et al.,* 13 Ark. 112; *Wells v. Morrow,* 38 Ala. 125; 4 Mayfield's Dig. Ala. p. 200.

The judgment of the lower court is reversed and remanded, with instructions to overrule defendant's demurrer, and proceed in accordance with this opinion.

All the Justices concur.